James R. FORTIER, and Holly W. Fortier, Individually and for their children, Leah Aimee Fortier, and Alais Noel Fortier, Charles F. Quandt, and Beverly A. Quandt, Individually and for their children, Vince A. Quandt, Brian V. Quandt, and Frederick C. Quandt, and Randall R. Ramsey, Plaintiffs,

v.

FLAMBEAU PLASTICS COMPANY a division of Flambeau Corporation, Defendant-Appellant,†

AMERICAN EXCESS INSURANCE COMPANY, and Highlands Insurance Group a/k/a Highlands Insurance Company, Defendants-Respondents,

The CITY OF BARABOO, a Wisconsin municipal corporation, Defendant-Appellant,

SAUK COUNTY, a body corporate, Sara Lee Corporation, a Maryland corporation, Teel Plastics Company, a Wisconsin corporation, and the following insurance corporations: The Aetna Casualty and Surety Company, Columbia Casualty Company, Continental Casualty, The Continental Insurance Company, Defendants,

EMPLOYER'S INSURANCE OF WAUSAU, Defendant-Respondent,

FIREMAN'S FUND/NATIONAL SURETY CORPORATION, Fireman's Fund of Wisconsin, Defendants,

---

† Petition to review denied.

GENERAL CASUALTY INSURANCE COMPANY OF WISCONSIN, Hartford Insurance Group, Hawkeye Security Insurance Company, Defendants-Respondents,

The HOME INSURANCE COMPANY, Integrity Insurance Company, Lloyd's of London, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, Pacific Employers, Puritan Insurance Company, Travelers Companies a/k/a Travelers Indemnity Company, and Wausau Insurance Company, Defendants.

James R. FORTIER, and Holly W. Fortier, Individually and for their children, Leah Aimee and Alais Noel Fortier, Charles F. Quandt and Beverly A. Quandt, Individually and for their children, Vince A., Brian V. and Frederick C. Quandt, and Randall R. Ramsey, Plaintiffs-Appellants-Cross Respondents,†

v.

The CITY OF BARABOO, a Wisconsin municipal corporation, Sauk County, a body corporation, Defendants,

FLAMBEAU PLASTICS COMPANY, a division of Flambeau Corporation, Sara Lee Corporation, a Maryland corporation, Defendants-Respondents-Cross Appellants,

TEEL PLASTICS COMPANY, a Wisconsin corporation, Defendant,

INDUSTRIAL COILS, a Wisconsin corporation, Defendant-Respondent-Cross Appellant,

† Petition to review denied.

The AETNA CASUALTY & SURETY COMPANY, Defendant-Cross Respondent,

AMERICAN EXCESS INSURANCE COMPANY, Continental Casualty, Employer's Insurance of Wausau, Defendants,

FIREMAN'S FUND/NATIONAL SURETY CORPORATION, Fireman's Fund of Wisconsin, Defendants-Cross Respondents,

GENERAL CASUALTY INSURANCE COMPANY OF WISCONSIN, Hartford Insurance Group, Hawkeye Security Insurance Company, Highlands Insurance Group, a/k/a Highlands Insurance Company, Integrity Insurance Company, Travelers Companies, a/k/a Travelers Indemnity Company, Wausau Insurance Company, Defendants.

Court of Appeals

*Nos. 89-0196, 89-0956. Oral argument October 18, 1990.—Decided September 19, 1991.*

(Also reported in 476 N.W.2d 593.)

642

644

645

646

For the plaintiffs-appellants the cause was submitted on the briefs of *Raymond M. Roder* and *Debra A. Anken-Dyer* of *Whyte & Hirschboeck, S.C.* of Madison. Oral argument by *Raymond M. Roder.*

For the defendant-appellant, City of Baraboo, the cause was submitted on the briefs of *James C. Bohl,* of *Quale, Hartman, Bohl, Stevens & Reynolds, S.C.* of Baraboo.

For the defendant-appellant and defendant-respondent-cross appellant, Flambeau Corporation, the cause was submitted on the briefs of *Clyde C. Cross* and

*Jerome P. Mercer* of *Cross, Jenks, Mercer and Maffei,* Baraboo. Oral argument by *Clyde C. Cross.*

For the defendants-respondents, American Excess Insurance Company and Highlands Insurance Group a/k/a Highlands Insurance Company, the cause was submitted on the briefs of *H. Robert Kilkelly, Jeffrey W. Younger,* and *Paul W. Schwarzenbart* of *Lee, Kilkelly, Paulson & Kabaker, S.C.* of Madison.

For the defendant-respondent, General Casualty Insurance Company of Wisconsin, the cause was submitted on the briefs of *Barrett J. Corneille,* of *Bell, Metzner, Gierhart & Moore, S.C.,* of Madison.

For the defendant-respondent, Employers Insurance of Wausau, the cause was submitted on the briefs of *Paul L. Gingras* and *Susan Hurt* of *Zelle & Larson* of Minneapolis, Minnesota, and of *Richard B. Allyn* of *Robins, Kaplan, Miller & Ciresi* of Minneapolis, Minnesota, and of *James Gerlach* of *Larowe, Gerlach, Chiquoine & Kahler* of Reedsburg.

For the defendant-respondent, Hartford Insurance Group, the cause was submitted on the briefs of *James C. Alexander* of *Sauthoff & Alexander* of Madison.

For the defendant-respondent, Hawkeye Security, the cause was submitted on the briefs of *C. Michael Hausman* and *D. Sean O'Lochlayne* of *Slattery & Hausman, Ltd.* of Milwaukee.

For the defendants-cross respondents, Fireman's Fund/National Surety Corporation and Fireman's Fund of Wisconsin, the cause was submitted on the briefs of *Daniel P. Golden* of *Anderson, Shannon, O'Brief, Rice & Bertz* of Plover, and of *William M. Savino, Daniel A. Bartoldus* and *Lawrence A. Levy* of *Rivkin, Radler, Dunne & Bayh,* Uniondale, New York.

For the defendants-cross respondents, The Aetna Casualty and Surety Company, the cause was submitted

on the briefs of *A. Reid Shaw* and *John C. Goodnow* of *Oppenheimer, Wolff & Donnelly* of Minneapolis, Minnesota. Oral argument by *John C. Goodnow.*

For the defendants-respondents-cross appellants, Sara Lee Corporation, the cause was submitted on the briefs of *Frank J. Daily* and *Jeffrey Morris* of *Quarles & Brady* of Milwaukee. Oral argument by *Jeffrey Morris.*

For the defendants-respondents-cross appellants, Industrial Coils, the cause was submitted on the briefs of *Rocke A. Calvelli* and *Gerald R. Harmon* of *Quale, Felbruegge, Calvelli, Thom & Croke* of Milwaukee. Oral argument by *Gerald R. Harmon.*

For the Wisconsin Insurance Alliance and Insurance Environmental Litigation Association, the cause was submitted on the briefs of *Robert C. Burrell* of *Borgelt, Powell, Peterson & Frauen, S.C.* of Milwaukee, and of *Thomas W. Brunner, Marilyn E. Kerst, John W. Cavilia* of *Wiley Rein & Fielding* of Washington, D.C.

For the Wisconsin Public Intervenor, Chemical Manufacturers Association, Wisconsin Paper Council, Wisconsin Academy of Trial Lawyers, Wisconsin's Environmental Decade, the cause was submitted on the briefs of *Gregory B. Conway* of *Liebman, Conway, Olejniczak & Jerry, S.C.* of Green Bay, and of *Thomas J. Dawson, State of Wisconsin Public Intervenor,* Madison, and of *Eugene R. Anderson, Thomas H. Sear, Thomas G. Rozinski* of *Anderson Kill Olick & Oshinsky, P.C.* of New York, New York.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

GARTZKE, P.J. The Fortiers, the Quandts and Ramsey appeal from a judgment dismissing their complaint against Flambeau Plastics Co., Sara Lee Corp., and Industrial Coils. The plaintiffs claim that the three companies deposited toxic chemicals in the City of

Baraboo's landfill and that the chemicals seeped or leached from it to the plaintiffs' nearby properties, contaminating their residential water wells and causing them personal injury and economic loss. The plaintiffs claim the companies are liable to them for having conducted an abnormally dangerous activity, as well as in negligence, nuisance and trespass. The city and the companies appeal from judgments dismissing their cross-claims against their insurers for coverage under liability policies. Industrial Coils cross-appeals against the plaintiffs on several procedural matters.[1]

---

[1]The plaintiffs brought this action in 1985. They eventually named as defendants the city, the three corporations named above, several other entities not relevant to this appeal, and twenty insurance companies believed to have provided coverage for the defendants at times relevant to the plaintiffs' claims. By trial court order of July 29, 1988, all defendants were apparently deemed to have cross-claimed against each other for contribution or indemnification. In November 1988, the trial court granted motions for summary judgment by six of the insurance companies dismissing the complaints against them on grounds that the coverage they provided did not cover the harm alleged by the plaintiffs. Flambeau and the city appealed from that judgment. That appeal was numbered 89-0196.

In early 1989, based on that decision by the trial court, insurers Aetna, Fireman's Fund, and Continental were granted summary judgments dismissing the complaints against them. The court also granted summary judgment to Flambeau, Sara Lee and Industrial Coils dismissing the plaintiffs' pollution claims against them. The plaintiffs appealed, and that appeal was numbered 89-0956. Flambeau and Sara Lee appealed from the summary judgments dismissing their cross-claims against Fireman's Fund and Aetna, respectively, and these were denominated cross-appeals in 89-0956. There has been no appeal of the dismissal of Continental. We consolidated 89-0196 and 89-0956.

We address three groups of issues. The first is whether the trial court properly granted the companies' motion[2] for summary judgment on grounds that they are not strictly liable or liable in negligence, nuisance or trespass. We conclude that the trial court properly dismissed the abnormally dangerous activity claim, but not the negligence claim (insofar as it is founded on a common-law duty), and the nuisance and trespass claims (to the extent they are founded on the defendants' negligence).

The second issue concerns the companies' cross-claims for insurance coverage. The question is the applicability of a pollution exclusion clause under Wisconsin and Illinois law. We conclude that the exclusion clause does not apply, and we reverse that part of the judgment dismissing the cross-claims against the insurers.

The third issue results from the cross-appeal of Industrial Coils. That cross-appellant asserts that the trial court lacked jurisdiction over it because the plaintiffs did not pay a filing fee when adding it as a defendant in an amended complaint, and that the trial court improperly modified the pretrial order. We reject both assertions.

## I. LIABILITY FOR POLLUTION

### 1. Standard Summary Judgment Methodology.

■ .

We employ a *de novo* review of the trial court's order granting summary judgment. *Bong v. Cerny,* 158 Wis. 2d 474, 478, 463 N.W.2d 359, 361 (Ct. App. 1990). Summary judgment is governed by sec. 802.08, Stats. Whether summary judgment should have been granted is

---

[2]We treat the individual motions of the companies as a single motion.

a question of law. *Waters v. United States Fidelity & Guar. Co.*, 124 Wis. 2d 275, 278, 369 N.W.2d 755, 757 (Ct. App. 1985). It is a method of determining whether a genuine issue exists as to any material fact which must be tried. If no such issue exists and the moving party is entitled to judgment as a matter of law, then the trial court must grant that judgment and we must affirm. If a genuine issue of any material fact exists, then summary judgment cannot be granted, and we must reverse. Neither the trial court nor this court has any discretion in the matter. *Wright v. Hasley*, 86 Wis. 2d 572, 578-79, 273 N.W.2d 319, 322-23 (1979).

### 2. Undisputed Facts

The companies do not contest the sufficiency of the complaint. Rather, they contend that the undisputed facts entitle them to summary judgment dismissing the plaintiffs' claims.

We have relied primarily but not exclusively on the parties' representation in their briefs as to what facts are undisputed. It appears from the briefs that the following facts are undisputed and are supported by affidavits and other materials the companies submitted with their motion for summary judgment.

The city opened the landfill in 1952 and closed it to the public in October 1973. During the 1950s, most of the 1960s and into the early 1970s, the city used the landfill for all of the garbage, trash and waste it collected from area homes, businesses, and industries, including those of the respondent companies. The landfill served the city and three townships, two villages and a state park. By 1970 it served a permanent population of 12,400 and a seasonal population of 17,500.

In 1969 the Wisconsin Department of Natural Resources (DNR) began to license solid waste disposal

sites. The DNR issued a "solid waste disposal operation license" to the city to operate the landfill for the period July 1, 1969, to June 30, 1970. The license authorized disposal of garbage, trash, "industrial," "commercial" and "other—trees and brush." It did not authorize disposal of hazardous material. A hiatus exists in the record with respect to licensing between July 1, 1970, and October 1, 1972, but from the latter date through September 30, 1973, the DNR licensed the city to dispose of the following types of waste at the landfill: "noncombustible, wood matter, trash, garbage." Thus, neither of the licenses authorized disposal of hazardous material.

Between 1952 and October 1973, all the companies dumped waste at the landfill. They transported their own waste to the landfill or had the city collect and haul it. Flambeau Plastics' waste included hydraulic oil and paint solvent. Klein Plastics' (now Sara Lee) waste included degreasing and dewaxing agents and solvents to reduce paints, clean equipment and mixers and stick plastic components together.

Recent evidence has shown that industrial or commercial waste, as well as municipal waste, often contain volatile organic compounds (VOCs). VOCs are manmade chemicals frequently used in industrial processes and maintenance practices. Their effects on human health can be detrimental if ingested, inhaled or absorbed into the body.

The waste deposited by the companies at the landfill contained, among others, the following VOCs: vinyl chloride, chloroethane, dichloroethane, trichloroethane, tetrachloroethane, trichloroethylene and tetrahydrofuran. Vinyl chloride is a known human carcinogen. It also causes acute depression of the central nervous system and chronic lung, liver and kidney abnormalities. Trichloroethylene and 1,2-dichloroe-

thane are two suspected weak human carcinogens. While trichloroethylene may cause acute depression of the central nervous system and liver and kidney malfunction, among other ailments, dichloroethane may be toxic to the extreme of causing death. The VOCs about which the plaintiffs complain were constituents of the waste of all who used the landfill—households, businesses and industries alike.

When the landfill was operated, nothing was placed over the filled areas to prevent periodic rain and snowmelt from seeping into the refuse mass and carrying chemicals into the subsurface and the groundwater. In the fall of 1988, the landfill was capped with a three-foot clay layer to significantly reduce the amount of rain or snowmelt from percolating through the soil and from leaching contaminants in or below the refuse mass to the groundwater table.

The plaintiffs' properties are downgrade from the landfill. A county road separates their properties from the landfill. The Ramseys moved to their property in 1959, the Fortiers in June 1979, and the Quandts in May 1984.

The DNR detected VOCs in the plaintiffs' well water in the late fall of 1984. The VOCs came from the landfill. The plaintiffs allege that as a consequence, they have suffered physical injuries and mental and emotional anguish. They fear present and future health problems from the effects of exposure to the toxic chemicals found in their well water, and they allege that danger exists from inhaling VOCs released by the waste which permeates their soil.

The VOCs detected in the plaintiffs' wells are common solvents that could be used in many manufacturing plants in any community. Some solvents are used in dry cleaning establishments and could be used in small gen-

eral machine shop operations to clean parts. VOCs in the plaintiffs' wells were not only available from the manufacturing plants in the area but from the garbage produced by residences in the area.

Virtually all of the VOCs detected in the plaintiffs' wells are used in common household products. In the opinion of a DNR witness, the VOCs in plaintiffs' wells are traceable back to the garbage or waste of just about anyone who used the landfill—households, commercial establishments and businesses alike. Household wastes such as paint remover, nail polish remover and shoe polish are sources of VOCs.

The only VOC-waste from Flambeau Plastics and Klein Plastics would have been common solvents left over from cleaning machinery and thinning paints. Most of Flambeau Plastics' products were not painted. The color was already in the plastic pellets which were then melted, molded and shaped. The quantities of solvents Flambeau and Industrial Coils used is not of record.

In 1962, Klein Plastics had six molding machines and a single shift for its painting operation. Klein began to grow significantly around 1968. From June 1, 1971, to December 31, 1973, when its painting operation was at its height, it used three paint thinners that generated liquid waste which might have contained any of the VOCs at issue. Its total consumption of those three products averaged 47.49 gallons per month. Most of that gallonage would evaporate during use and little of it would have ended up as waste.

The companies are relatively small manufacturing concerns with no special scientific sophistication. They employed existing technology and had no chemists or chemical engineers on their staff. None of the companies—or the city of Baraboo—knew that the disposal of

655

waste solvents at the landfill posed a risk of contaminating the groundwater beneath it.

In the early 1980s researchers learned that leachate generated at Wisconsin landfills had significant levels of VOCs. Before the early 1980s only inorganic compounds were monitored as evidence of contamination. In the early 1980s, the DNR began to actively monitor landfills for organic contamination.

The DNR conducted two recent formal studies (neither of which is shown to have involved the Baraboo landfill) showing that household and commercial wastes have caused more VOC contamination than industrial waste. A 1988 study found that most industrial waste leachate contained fewer VOCs, at lower concentrations, than municipal landfill leachate.[3] A second 1988 study sampled nineteen municipal dumps and found VOCs in fifteen of them. Two of those sites had received industrial waste. All the others accepted only residential, commercial, institutional and demolition waste.[4]

Plaintiffs' scientific experts[5] are Dr. David Edgington, a geochemist at the University of Wisconsin Center for Great Lakes States Study, and Thomas Miazga, a hydrogeologist with the DNR. Dr. Edgington deposed that in his opinion, "on the basis of what was accepted and common scientific knowledge at the time that you started the [Baraboo] dump, it was a perfectly reasonable activity . . .. Things change though; and some things

---

[3]See W.M. Friedman, Volatile Organic Compounds in Groundwater and Leachate at Wisconsin Landfills 14 (Feb. 1988) (DNR unpublished formal study).

[4]See J. Battista & J.P. Connelly, VOC Contamination at Selected Municipal and Industrial Landfills in Wisconsin—Sampling Results and Policy Implications 4-5 (Sept. 1988) (DNR unpublished formal study).

[5]So far as this record discloses, defendants have no experts.

don't change, unfortunately. And I would not say, yes, it was bad or good. It was acceptable engineering in those days. We all have to learn from our mistakes." In the mid-to-late 1970s, the scientific community first started to appreciate that the landfilling of common solvents (like those at issue) might present a problem. Thomas Miazga deposed that before 1974 the DNR accepted the "natural attenuation landfill" theory: that liquids could be dumped almost anywhere because the ground acted as a charcoal-like filter.

In mid-1969, four years before the landfill was closed to the public, the DNR adopted its first regulations regarding "solid waste disposal." Wisconsin Adm. Code sec. RD 51 (1969). "Solid waste," for purposes of regulation, encompassed liquids as well as solids.

Disposal of "toxic and hazardous wastes" at the Baraboo landfill was considered safe from the standpoint of groundwater protection because, according to Miazga, the groundwater is a full ninety feet below the landfill ground level, nine times the separation specified in the DNR's 1969 regulations.[6]

3. <u>Negligence</u>

a. <u>Negligence Per Se: Violation of DNR Rules</u>

Plaintiffs assert that the companies violated Wis. Adm. Code sec. RD 51, Solid Waste Disposal (1969).[7] Plaintiffs conclude that the violation is negligence per se

---

[6]Wisconsin Adm. Code sec. RD 51.02(5) (1969) defined toxic and hazardous waste as "waste materials such as pesticides, acids, caustics, pathological wastes, radioactive materials, flammable or explosive materials, and similar chemicals and harmful wastes which require special handling and disposal to protect and conserve the environment."

[7]The rules covering environmental protection, including

and that the companies are therefore liable to them. We agree that the companies violated sec. 51 but we conclude that their violations do not make the companies liable to the plaintiffs. We apply Restatement (Second) of Torts sec. 286 (1965)[8] to determine whether a legislative enactment or an administrative rule can be adopted as a standard of conduct in a negligence action. *Nordeen v. Hammerlund,* 132 Wis. 2d 164, 167, 389 N.W.2d 828, 829-30 (Ct. App. 1986). For a rule or statute to form a basis for civil liability, expression of legislative intent is necessary that the section become a basis for such liability. *Id.* at 168, 389 N.W.2d at 830. Intent may be supplied by necessary implication from the language of the statute. *Id.* at 168-69, 389 N.W.2d at 830.

The defendants violated the solid waste disposal rules by disposing hazardous waste at a landfill not licensed to receive it. The solvents and other chemical compounds the defendants deposited at the landfill were toxic and hazardous wastes, as defined in Wis. Adm. Code sec. RD 51.02(5). Such wastes come within the definition of "refuse" and are therefore "solid waste." Wisconsin Adm. Code sec. RD 51.02(1) and (3). Wisconsin Adm. Code sec. RD 51.05(1) imposed upon the owner

---

solid waste, have since been revised and renumbered. *See* Wis. Adm. Code secs. NR 100-685 (1991).

[8]Section 286 of the Restatement provides:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and
(b) to protect the particular interest which is invaded, and
(c) to protect that interest against the kind of harm which has resulted, and
(d) to protect that interest against the particular hazard from which the harm results.

of any business establishment or industry the responsibility "for the satisfactory collection and transportation of all solid waste accumulated at that . . . business establishment or industry *to a solid waste disposal site or facility . . ..*" (Emphasis added.) Wisconsin Adm. Code sec. RD 51.06 prohibited the disposing of any solid waste "at any site or facility not licensed by the department . . .," with exceptions not pertinent to this case.

The DNR issued solid waste disposal operation licenses to the city of Baraboo covering operations after July 1, 1969, but those licenses excluded the disposal of hazardous material. By depositing their hazardous wastes after July 1, 1969, at a landfill which could not lawfully accept them, the companies violated Wis. Adm. Code sec. RD 51.06 (1969).

The DNR's 1969 solid waste rules were adopted not only to protect the public but also a specific class of property owners which includes the plaintiffs. That class consists of owners whose water supplies may be affected. The rules show special concern that water supplies not be contaminated. Wisconsin Adm. Code sec. RD 51.10(2)(g) required landfill operators to dispose of toxic and hazardous wastes in compliance with Wis. Adm. Code sec. RD 51.10(3). The latter subsection provided in relevant part:

> Significant quantities of toxic and hazardous wastes shall be disposed of in accordance with the following procedures:
>
> . . ..
>
> (b) . . . The disposal site shall be downgrade and away from any wells, buildings, crops and livestock holding, exercise or pasture areas.

We reject the companies' contention that because they have not deposited "significant quantities of toxic and hazardous wastes" at the landfill, they did not violate Wis. Adm. Code sec. RD 51 (1969). As the parties moving for summary judgment dismissing the complaint, they bear the burden to establish a *prima facie* defense. If their defense is that they did not deposit "significant quantities," they have not met the burden. Industrial Coils produced no evidence regarding quantities. Nor did Flambeau Plastics. Klein presented fourteen exhibits showing the gallons of compounds containing VOCs it purchased between June 1, 1971, and December 31, 1973. For example, the first such exhibit shows that during that period Klein purchased 815 gallons of 1-1-1 trichloroethane, but no exhibit shows how much ended up in the landfill.

However, that the companies violated an administrative rule intended to benefit a special class of which the plaintiffs are members does not necessarily create a private right of action in plaintiffs' favor against the companies. "[T]hat a rule is enacted for the benefit of a particular class of persons is not to say it creates a private right of action to assure that those benefits are realized . . .. [T]he touchstone . . . is the presence of an expression of legislative intent specifically to create such a right, and the form and language of the rule are the primary indicators of such an expression." *Kranzush v. Badger State Mut. Casualty Co.,* 103 Wis. 2d 56, 79–80, 307 N.W.2d 256, 268 (1981). We find no such expression of intent.

The DNR adopted Wis. Adm. Code sec. RD 51 (1969) pursuant to secs. 144.43 and 144.44, Stats. (1969). Section 144.43, required the DNR to "prepare and adopt

660

minimum standards for the location, design, construction, sanitation, operation and maintenance of solid waste disposal sites and facilities and . . . adopt such rules relating to the operation and maintenance of solid waste disposal sites and facilities as it deems necessary." Section 144.44(1), Stats., provided that after the department has promulgated such standards, no person shall maintain a solid waste disposal site which does not adhere to such standards, and that the sites shall be licensed annually by the DNR. Nothing in either statute evinces an intent to create a private right of action for violations.

Sections 144.43 and 144.44(1), Stats. (1969), were created by sec. 6, ch. 83, Laws of 1967. Nothing in the lengthy "statement of policy and purposes" prefacing ch. 83 evinces such an intent. Nor did any other part of ch. 144, Stats. (1969), indicate an intent to create a private right of action against a violation of the DNR's solid waste disposal records.

On the contrary, sec. 144.536, Stats. (1969), required the attorney general to enforce the orders of the DNR. It provided that if an order prohibits pollution, violation of it "shall be deemed a *public* nuisance." (Emphasis added.) Section 144.537, Stats. (1969), directed the DNR to hear complaints relating to alleged or potential environmental pollution and to issue orders on such complaints. We infer from these provisions that the legislature intended that the violation of the DNR's solid waste disposal regulations is a public rather than a private wrong.

We conclude that the defendants' violation of Wis. Adm. Code sec. RD 51 (1969), does not give rise to a private right of action in the plaintiffs against the defendants.

### b. Common Law Negligence

The companies assert that when they used the landfill, they could not have been expected to have known that dumping their waste ran the risk of contaminating groundwater in the area. This, they assert, entitles them to summary judgment dismissing the plaintiffs' common law negligence claims. We disagree.

Summary judgment dismissing a complaint based on common law negligence is rarely granted. *See Ruppa v. Am. States Ins. Co.,* 91 Wis. 2d 628, 646, 284 N.W.2d 318, 325 (1979) (whether person exercised due care should not be determined on summary judgment); *Ceplina v. S. Milw. School Bd.,* 73 Wis. 2d 338, 342, 243 N.W.2d 183, 185 (1976) (summary judgment does not lend itself well to negligence questions); *Dottai v. Altenbach,* 19 Wis. 2d 373, 375, 120 N.W.2d 41, 42 (1963) ("It is a rare case when summary judgment can be granted in an action grounded on negligence."); *State Bank of La Crosse v. Elsen,* 128 Wis. 2d 508, 517, 383 N.W.2d 916, 920 (Ct. App. 1986) (summary judgment usually inappropriate to resolve negligence issues).[9]

---

[9]That is not to say, however, that summary judgment has never been granted dismissing a complaint grounded on negligence. *See Griebler v. Doughboy Recreational, Inc.,* 160 Wis. 2d 547, 557, 466 N.W.2d 897, 901 (1991) (diving into water of unknown depth is open and obvious danger); *Marshall v. Miles,* 54 Wis. 2d 155, 161, 194 N.W.2d 630, 633 (1972) (plaintiff's fall had nothing to do with adequacy of ladder plaintiff had previously found satisfactory); *Davenport v. Gillmore,* 146 Wis. 2d 498, 508, 431 N.W.2d 701, 706 (Ct. App. 1988) (plaintiff's running dive into shallow, opaque water presented open and obvious danger); *Colip v. Travelers Ins. Co.,* 141 Wis. 2d 363, 366, 415 N.W.2d 525, 527 (Ct. App. 1987) (plaintiff knew when he dove into water he had to miss intervening sandbar).

Common law negligence is failure to exercise reasonable care to avoid the risk of foreseeable harm to others. "A party is negligent when he commits an act when some harm to someone is foreseeable. Once negligence is established, the defendant is liable for unforeseeable consequences as well as foreseeable ones. In addition, he is liable to unforeseeable plaintiffs." *A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 484, 214 N.W.2d 764, 766 (1974).

Assuming the companies have shown that when they used the landfill they did not know[10] they ran the risk of contaminating the groundwater, whether they should have known is another matter. Two facts, the existence of DNR's 1969 rules and the terms of the Baraboo landfill license, prevent us from holding that, as a matter of law, the companies were not negligent after those rules were adopted. First, as we have said, the DNR's rules evince special concern that water supplies not be contaminated. We have already quoted Wis. Adm. Code sec. RD 51.10(3) (1969), which shows on its face that risk exists from depositing toxic and hazardous wastes in the absence of precautions. Second, the Baraboo landfill was not licensed to receive the companies' hazardous wastes. A fact-finder could conclude that the companies should have known that their use involved the risk of some harm to persons whose water supply could be polluted.

[10]We note that summary judgment does not lend itself well to determining a state of mind. *Brown v. Hammermill Paper Co.*, 88 Wis. 2d 224, 238, 276 N.W.2d 709, 715 (1979); *Lecus v. American Mut. Ins. Co. of Boston*, 81 Wis. 2d 183, 190, 260 N.W.2d 241, 244 (1977).

Moreover, the DNR's hydrogeologist, Mr. Miazga, upon whose testimony the companies partly rely, was equivocal in his testimony regarding the foreseeability of harm even before 1969. He testified that "just in hindsight . . . [i]f I was around in 1960, I could have told them there was going to be a problem [at the Baraboo landfill], but I wasn't there."

The companies contend that we should nevertheless grant summary judgment in their favor. They assert that an adequate time for discovery has passed and in response to the motion for summary judgment the plaintiffs failed to make a showing sufficient to establish an element essential to their claim. The essential element is that the companies should have foreseen the risk of harm to someone from their use of the landfill. The companies rely on United States Supreme Court cases applying the federal summary judgment rule, Fed. R. Civ. P. 56. Those cases are *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The federal summary judgment rule, Fed. R. Civ. P. 56, is identical in pertinent respects to our summary judgment statute, sec. 802.08, Stats. Whether *Celotex* and *Matsushita* are consistent with Wisconsin summary judgment methodology is an open question.

The *Matsushita* court held that when the party moving for summary judgment supports its motion adequately, the party opposing the motion must come forward with specific facts showing a genuine dispute. *Matsushita*, 475 U.S. at 586-87. The *Matsushita* court added consideration of plausibility to federal summary judgment methodology. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587. If the factual context renders the nonmoving

party's claim "*implausible,*" the nonmovant "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 587 (emphasis added).

The *Matsushita* emphasis on "plausibility" may be consistent with Wisconsin summary judgment methodology. Under our methodology, the court does not decide an issue of fact.[11] The court decides only whether a genuine issue of fact exists. *Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473, 477 (1980). The court does not decide issues of credibility, weigh the evidence, or choose between differing but reasonable inferences from the undisputed facts. That does not necessarily exclude deciding whether a rational trier of fact could find that the nonmoving party's claim is plausible.[12]

Here, however, the evidence relied upon by the companies themselves includes the DNR's 1969 solid waste disposal requirements and the licenses issued for the Baraboo landfill. A rational trier of fact could find for plaintiffs on the basis of that evidence. The plaintiffs

[11]For this reason, when deciding a motion for summary judgment, the trial court is not expected to make findings of fact. *State Bank of La Crosse v. Elsen,* 128 Wis. 2d 508, 515–16, 383 N.W.2d 916, 919 (Ct. App. 1986). See, however, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n.6 (1986) (findings of fact are not required but can be helpful to a reviewing court).

[12]Testing evidence for "plausibility" is no stranger to our jurisprudence. When determining whether an accused shall be tried, the court does not decide guilt or credibility but only whether the state presented "a believable or plausible account of the defendant's commission of a felony." *State v. Dunn,* 121 Wis. 2d 389, 398, 359 N.W.2d 151, 155 (1984) (footnote omitted). Whether an account is plausible is a question of law. *Id.* at 399, 359 N.W.2d at 155.

have a plausible claim on the basis of that evidence. They need not furnish more to defeat the companies' motion for summary judgment, even under *Matsushita*.

In *Celotex*, the plaintiff claimed that her husband's death resulted from exposure to asbestos manufactured or distributed by the defendants. The defendants moved for summary judgment dismissing the complaint, on grounds that in answer to their interrogatories, the plaintiff failed to identify any witness who could testify to her husband's exposure to defendants' asbestos products. The *Celotex* court held that the federal summary judgment rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The moving party is entitled to summary judgment upon "a complete failure of proof" by the party opposing summary judgment as to an essential element as to which that party bears the burden of proof. *Id.* at 323.

In the plaintiffs' case, no complete failure of proof exists regarding the foreseeability element of their common law negligence claim. The DNR's solid waste disposal rules after mid-1969 and the Baraboo landfill licenses are evidence from which the trier of fact could conclude the companies should have known after that time that a risk of harm existed from their use.

We conclude that under standard Wisconsin summary judgment methodology, and a *Matsushita* or *Celotex* analysis, the companies' motion for summary judgment dismissing the plaintiffs' common law negligence claims should have been denied.

### 4. Strict Liability for Abnormally Dangerous Activity

Plaintiffs assert that the companies' depositing of hazardous wastes at the landfill was an "abnormally dangerous activity." Section 519 of the Restatement (Second) of Torts (1977) subjects an actor to strict liability for having carried on such an activity. Section 520 of the Restatement lists guidelines for determining whether an activity is abnormally dangerous. Sections 519 and 520 are part of the common law of this state. *Bennett v. Larsen Co.,* 118 Wis. 2d 681, 703, 348 N.W.2d 540, 553 (1984); *Brown v. L.S. Lunder Constr. Co.,* 240 Wis. 122, 128, 2 N.W.2d 859, 861 (1942) (citing Restatement of Torts secs. 519–522 (1938)).

Section 519 of the Restatement (Second) provides:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Section 520 of the Restatement (Second) provides:

> In determining whether an activity is abnormally dangerous, the following factors are to be considered:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;

> (b) likelihood that the harm that results from it will be great;

667

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

If the facts are undisputed, whether an activity is abnormally dangerous "is to be determined by the court, upon consideration of all the factors listed in [sec. 520], and the weight given to each that it merits upon the facts in evidence." Section 520, comment 1. Thus, the *Bennett* court treated the question as one of law. After considering the six factors in sec. 520(a)-(c), the *Bennett* court held that pesticide spraying, under the circumstances presented, was not an abnormally dangerous activity or, as the court described it, an "ultrahazardous activity." *Bennett,* 118 Wis. 2d at 704, 348 N.W.2d at 553.

For purposes of summary judgment analysis, we treat the uncontroverted facts as undisputed. The question before us is whether the uncontroverted facts establish that the companies' use of the landfill was an abnormally dangerous activity at any time until the landfill closed in 1973.

That the companies conducted their disposal activities on the lands of another does not save them from strict liability if their activities were abnormally dangerous. Section 520, comment e. *See Kenney v. Scientific, Inc.,* 497 A.2d 1310 (N.J. Super. Ct. Law Div. 1985)

668

(generator of toxic waste disposed of at another's landfill can be strictly liable for harm to nearby landowners).

However, our application and weighing of the sec. 520 guidelines leads us to conclude that the companies' use of the landfill was not an abnormally dangerous activity.[13]

When discussing the section 520(a) guideline, the companies concede for purposes of their motion that a high degree of risk attached to their depositing compounds containing VOCs at the landfill. This guideline therefore favors a conclusion the companies' use of the landfill was abnormally dangerous.

The companies do not concede that the "likelihood that the harm that results from [their activity] will be great," the sec. 520(b) guideline. They assert that even after two decades of the entire community depositing VOCs at the landfill, the groundwater is "minimally" contaminated.[14]

---

[13]In *State, Dep't of Envtl. Protection v. Ventron Corp.*, 468 A.2d 150, 159–60 (N.J. 1983), the New Jersey Supreme Court referred to the "case-by-case" analysis required by sections 519 and 520 of the Restatement but broadly announced that:

> [M]ercury *and other toxic wastes* are "abnormally dangerous," and the disposal of them, past or present, is an abnormally dangerous activity. We recognize that one engaged in the disposing of toxic waste may be performing an activity that is of some use to society. Nonetheless, "the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it." (Emphasis added) (quoting from Restatement (Second) of Torts sec. 520 comment h (1977)).

We consider the *Ventron* court's announcement far too broad as to "other toxic wastes" and inconsistent with a case-by-case analysis.

[14]The evidence supporting their motion is mixed in this

The companies' approach to sec. 520(b) confuses likelihood of great harm with the amount of actual harm. Section 520(b) is merely one of six guidelines used to determine whether an activity is abnormally dangerous. If an activity is abnormally dangerous, then strict liability attaches to the resulting harm, whether the actual harm is minimal or catastrophic. The amount of actual harm will affect the damages recoverable by a plaintiff but not the actor's liability for that harm.

Section 520(b) looks to the "likelihood" that the harm will be great. That "likelihood" for VOCs has been shown to be "great." For example, the DNR's letter to the Ramseys, read with its attachments, shows that the compounds found in their water can cause liver damage or abnormalities. We conclude that the "likelihood" referred to in sec. 520(b) exists. Accordingly, this guideline favors our concluding that the companies' use of the landfill was abnormally dangerous.

The companies take two positions regarding the sec. 520(c) guideline, "inability to eliminate the risk by the exercise of reasonable care."[15] They first contend that the policy of Wisconsin is to make their liability turn on the standard of conduct in existence when they used the landfill. To support this proposition, they rely on part of

---

regard. In 1985, the DNR advised the Ramsey's that eight compounds had been found in their water "in excess of the detection limit," but 1,2-dichloroethane was found "in excess of an action level," a "high concentration." The DNR advised the Quandts that "[n]one of the compounds detected in your water are present in excess of an action level (health advisory level)." The DNR similarly advised the Fortiers.

[15] "Central to the concept of ultrahazardous activity . . . is that there be a risk of harm that cannot be eliminated through the exercise of due care." *O'Neal v. International Paper Co.*, 715 F.2d 199, 202 (5th Cir. 1983).

Wisconsin's "environmental repair" statute, sec. 144.442(9)(c), Stats. (1989-90), pertaining to the liability of an owner or operator of a solid or hazardous waste disposal site facility. The companies, of course, were generators of hazardous waste rather than owners or operators of a hazardous waste disposal site. However, they look to sec. 144.442(9)(c) as an analogy. That statute provides in part:

> 1. An owner or operator is responsible for conditions at [such a site or facility] which presents a substantial danger to public health or welfare or the environment *if the person knew or should have known at the time the disposal occurred* that the disposal was likely to result in or cause the release of a substance into the environment in a manner which would cause a substantial danger to public health or welfare or to the environment.
>
> 2. Any person, including an owner or operator . . . is responsible for conditions at a site or facility which present a substantial danger to public health or welfare or the environment if:
>
> . . ..
>
> b. The person's action related to the disposal caused or contributed to the condition at the site or facility and would result in liability under *common law in effect at. the time the disposal occurred, based on standards of conduct for that person at the time the disposal occurred.* (Emphasis added.)

The companies contend that Dr. Edgington and Mr. Miazga have confirmed that when the companies used the landfill, they followed accepted practices and did not violate a standard of conduct for landfill users. They rely particularly on Dr. Edgington's testimony to the effect that their use of the landfill was "acceptable engineer-

ing" in view of the then accepted and common scientific knowledge.[16]

Dr. Edgington cannot have referred to the companies' use of the Baraboo landfill after the DNR's 1969 solid waste disposal rules were effective. Their use of the landfill after that date violated those rules, and the companies should have known that. That violation renders inapplicable any analogy to sec. 144.442(9)(c)1., Stats.

The proposed analogy to sec. 144.442(9)(c)2.b., Stats., also fails. If we look to the common law in effect at the time the disposal occurred, the strict liability provisions of secs. 519 and 520 of the Restatement (Second) applied. Those provisions impose strict liability for harm resulting from an abnormally dangerous activity, whether or not the actor complied with a standard of conduct. Sections 519 and 520 are part of the common law of this state. *See Bennett,* 118 Wis. 2d 681, 348 N.W.2d 540. It is immaterial that *Bennett* was decided in 1984, after the companies disposed of waste at the

---

[16]The companies argue for a state-of-the-scientific-knowledge defense but cite no cases to support it. We have found none pertinent to abnormally dangerous activities. The reporters for the American Law Institute's, *Enterprise Responsibility for Personal Injury, Volume II, Approaches to Legal and Institutional Change,* (1991) at 368, seem to acknowledge that the state of knowledge is not yet a Restatement sec. 520 factor. However, the reporters favor an approach which

> would refine the Restatement tradition reflected in Section 520 by making it clear that an environmentally risky activity should not be considered "abnormally dangerous" if the scientific state of knowledge at the time gave no signal that the activity posed a substantial risk to human health. On the other hand, strict liability could be imposed regardless of whether there was technology available at the time that could have avoided or reduced the risk in question. Thus, a limited "state of knowledge" defense would be available even if the other factors set out in the Restatement were satisfied, but a "state of the art" defense would not be available.

landfill. In *Brown v. L.S. Lunder Constr. Co.*, 240 Wis. 122, 128, 2 N.W.2d 859, 861 (1942), the Wisconsin Supreme Court cited secs. 519 through 522, Restatement of Torts (1938), with approval.[17] Thus, the common law of Wisconsin has adopted secs. 519 and 520 of the Restatement (Second) of Torts and its predecessor sections since 1942.

The companies' second position is that the DNR's current regulations show that the high risk attending the deposit of VOCs at a landfill can be eliminated with reasonable precautions. For that reason, they assert, sec. 520(c) does not apply. They rely on Wis. Adm. Code sec. NR 181.13(2)(b)(3)(1988), which allows certain generators of hazardous wastes to dispose of their wastes at a solid waste disposal facility licensed to accept such wastes. We disagree with that analysis. The regulations fail to establish that the risk referred to in sec. 520(c) can be "eliminated" with the exercise of reasonable care. At most, the regulations represent an attempt to minimize the risk. The companies have presented no other evidence that the risk can be eliminated.

---

[17]Section 519, Restatement of Torts, provided:

> Except as stated in §§ 521-4, one who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultrahazardous, although the utmost care is exercised to prevent the harm.

Section 520, Restatement of Torts, provided:

> An activity is ultrahazardous if it
>
> (a)  necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and
>
> (b)  is not a matter of common usage.

We conclude that the sec. 520(c) guideline, "inability to eliminate the risk by the exercise of reasonable care," favors our concluding that the companies' use of the landfill to dispose of wastes containing VOCs was abnormally dangerous.

We turn to the factors in sec. 520(d), (e) and (f): the extent to which the activity is not a matter of common usage, the inappropriateness of the activity and the place where it was carried on, and the extent to which the value to the community is outweighed by its dangerous attributes. At this point we distinguish between the companies' activities before and after the DNR promulgated its 1969 regulations.

The companies have made a *prima facie* showing that before the 1969 DNR regulations were promulgated, depositing compounds containing VOCs at the landfill was a matter of common usage, that the activity was carried on at what the community considered an appropriate place, and that its value to the community at that time was believed to outweigh its dangerous attributes. Before 1969, when they used the landfill, none of the companies knew that they were conducting a dangerous activity, they used the municipal landfill regularly and they did so because they had to deposit their wastes somewhere. The municipality itself collected and deposited some of the companies' wastes at the landfill. As we have noted, before 1970 Baraboo used its landfill for all of the waste it collected from all households, businesses, and industries in the Baraboo area. Household and commercial wastes contain VOCs. The DNR's recent landfill studies establish that fact. Baraboo's pre-1969 use of the landfill shows that the value of all generators' (including the companies') use of the landfill to the community outweighed the dangerous attributes of such use.

674

After the 1969 regulations became effective, the situation changed, but only for the companies. Households continued to generate waste containing VOCs. That waste was lawfully deposited at the landfill. The companies also continued to deposit hazardous waste, and their deposits which also contained VOCs violated the DNR rules. Their depositing of wastes containing VOCs at the landfill was part of a common usage. But because the landfill license issued to Baraboo did not permit it, the companies' use of the landfill was inappropriate to the place where it was carried on.

The fact remains, however, that after 1969 the value to the community of the use of the landfill for VOC-waste continued as before to outweigh its dangerous attributes. After 1969 the municipality continued to collect waste from all sources, including households. By 1970, the landfill served a permanent population exceeding 12,000 persons and a seasonal population exceeding 17,000. The undisputed evidence establishes that municipal waste from varied sources contains VOCs. After 1969, nobody—not even the DNR—disapproved of households' disposing of VOC-waste at the landfill. The Baraboo landfill continued to accept VOC wastes.

We conclude that the companies have shown that their depositing of compounds containing VOCs at the Baraboo landfill was not an abnormally dangerous activity before and after the DNR's 1969 rules. For that reason, the strict liability provision of sec. 519 Restatement (Second) of Torts does not apply to the companies' use of the landfill. The trial court properly dismissed the strict liability claims against the companies.

5. Private Nuisance

"A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts sec. 821(d) (1979). Wisconsin has adopted the analysis for private nuisance set forth in sec. 822, Restatement (Second) of Torts. *Prah v. Maretti,* 108 Wis. 2d 223, 231, 321 N.W.2d 182, 187 (1982). Section 822 provides:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

It is undisputed that chemical compounds containing VOCs seeped from the landfill into plaintiffs' well water. Chemicals seeping or percolating through groundwater can constitute an invasion. *See, e.g., Branch v. W. Petroleum, Inc.,* 657 P.2d 267, 273–76 (Utah 1982), and Comment, *Liability of Landowner for Pollution of Percolating Waters,* 39 Marq. L. Rev. 119, 130 (1955) (citing early nuisance cases). We have already concluded that the companies are not entitled to dismissal of the plaintiffs' claim based on common law negligence. Because under sec. 822(b) a negligent invasion may be the basis of liability under a private nuisance theory, the companies have not shown that they are entitled to summary judgment dismissing the plaintiffs' claims for private nuisance.

### 6. Trespass

Trespass may be either an intentional intrusion or an unintentional intrusion resulting from reckless or negligent conduct or from an abnormally dangerous activity. Restatement (Second) of Torts secs. 158 and 165 (1965). No evidence exists that any of the companies intentionally intruded upon the plaintiffs' lands. We therefore review the liability of the companies under sec. 165 of the Restatement for unintentional intrusion.

Restatement (Second) of Torts sec. 165 provides:

> One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, to a thing or a third person in whose security the possessor has a legally protected interest.

The supreme court of this state has never cited Restatement (Second) of Torts sec. 165, but it has implied that negligent trespass can be actionable. *See Wisconsin Power & Light Co. v. Columbia County,* 18 Wis. 2d 39, 46, 117 N.W.2d 597, 600–01 (1962). We conclude that sec. 165 applies in this state.

Compounds containing VOCs have intruded into plaintiffs' well water. The plaintiffs claim that they personally and their lands have been harmed by the intrusion. The intrusion may have resulted from negligence. The companies are not entitled to summary judgment

dismissing the plaintiffs' claim for trespass.[18]

## II.   INSURANCE ISSUES

The plaintiffs named as defendants twenty liability insurance companies who issued policies to the companies and Baraboo. By court order, all defendants were deemed to have cross-claimed against each other, and all such claims were deemed denied. The trial court granted the motion of nine of the insurers seeking summary judgment dismissing the complaints against them. The court ruled their policies excluded coverage. The companies and Baraboo appeal. Since the trial court's ruling, the Wisconsin Supreme Court has decided the issue in favor of coverage. We therefore reverse the ruling.

The insurers argue that coverage is excluded by nearly identical clauses in their policies. The clauses exclude coverage for damage caused by pollutants unless the discharge is "sudden and accidental."[19] The insurers argue that the discharge alleged by plaintiffs was not "sudden and accidental," and coverage is therefore excluded. The companies and Baraboo rely on the general coverage in the policies, which provides that the insurer will pay for damage caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

---

[18]The companies do not argue that subsurface invasion should not be regarded as nontrespassory. We need not address the issue.

[19]One policy provides: "[T]this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

The parties agree that Wisconsin law applies except as to Aetna's policy. In *Just v. Land Reclamation, Ltd.,* 155 Wis. 2d 737, 746, 456 N.W.2d 570, 573 (1990), the supreme court concluded that the phrase "sudden and accidental" in the pollution exclusion clause involved here means "damages that are unexpected and unintended." The order dismissing the complaints as to all companies except Aetna must be reversed for that reason.[20]

The appeal by Sara Lee, as successor to Klein Plastics, from the order dismissing its insurer, Aetna, centers on the same clause and arguments, but under Illinois law.[21] The Illinois intermediate appellate courts differ on the effect of the pollution exclusion clause.[22] The Illinois Supreme Court has not resolved the conflict. We therefore choose what we consider the better view. *See Haines v. Mid-Century Ins. Co.,* 47 Wis. 2d 442, 177 N.W.2d 328 (1970).

---

[20]We need not address the argument that General Casualty and Hawkeye Security waived their right to deny coverage.

[21]In the trial court, Sara Lee (previously known as Klein Plastics) argued for the application of Illinois law. Following the decision in *Just,* Aetna agreed that Illinois law applies. We have reviewed the affidavits describing the relevant facts in light of Wisconsin's choice of law analysis, *see Belland v. Allstate Ins. Co.,* 140 Wis. 2d 391, 410 N.W.2d 611 (Ct. App. 1987), and conclude that Illinois law applies.

[22]*International Minerals & Chem. Corp. v. Liberty Mut. Ins. Co.,* 522 N.E.2d 758 (Ill. App. Ct. 1988), takes a view of the pollution exclusion clause favorable to Aetna. Illinois courts held favorably to Sara Lee's position in *United States Fidelity and Guar. Co. v. Specialty Coatings Co.,* 535 N.E.2d 1071 (Ill. App. Ct. 1989), and *Reliance Ins. Co. v. Martin,* 467 N.E.2d 287 (Ill. App. Ct. 1984).

As discussed above, in *Just* the Wisconsin supreme court determined the effect of the pollution exclusion clause. We are obligated to hold that the Wisconsin Supreme Court's view is the "better rule." We conclude that the applicable Illinois law is that set forth in the *Specialty Coatings* and *Reliance* decisions. We hold that Aetna's policy provides coverage. The order of dismissal as to Aetna must be reversed.

## III. INDUSTRIAL COILS' CROSS-APPEAL

Industrial Coils contends that because the plaintiffs did not pay a filing fee when adding it as a defendant, the trial court lacked personal jurisdiction over it. Industrial Coils also contends the court erred by modifying a pretrial order so as to allow a third amended summons and complaint. We reject both contentions.

The plaintiffs filed their initial summons and complaint in October 1985, and their first amended summons and complaint in July 1986. Neither named Industrial Coils as a defendant. In March 1987, the trial court issued a pretrial order setting a trial date in April 1988 and establishing deadlines to amend the pleadings. In April 1987, before the deadline expired, the court extended the deadline to June 15, 1987.

On June 18, 1987, the plaintiffs filed their second amended complaint, without a summons. The amended complaint added more than a dozen insurance company defendants and two non-insurance defendants, including Industrial Coils. On July 16, 1987, Industrial Coils moved to dismiss.

Before that motion was heard, the plaintiffs filed their second amended summons naming Industrial Coils, and on August 7, 1987, Industrial Coils was served with a copy of this summons and another copy of the second

amended complaint. On August 26, 1987, Industrial Coils again moved to dismiss. The second motion was set to be heard with the first. Before either was heard, the plaintiffs filed their third amended summons and complaint on September 9, 1987, and on September 11, 1987, plaintiffs served Industrial Coils with copies of the third amended summons and complaint.

The plaintiffs paid no fee when filing their amended summons and complaints, all of which were given the case number assigned to the first complaint.

The trial court heard Industrial Coils' motions in June 1988. It dismissed without prejudice the plaintiffs' claims in their second amended complaint. On its own motion, the court modified its April 1987 scheduling order to provide that plaintiffs shall have until September 9, 1987, to file an amended complaint and denied the motion to dismiss the third amended complaint filed on September 9, 1987. The court eventually granted summary judgment dismissing the plaintiffs' claims against Industrial Coils. Industrial Coils cross-appeals the order denying its motion to dismiss the September 9, 1987 complaint.

Industrial Coils argues that a filing fee must be paid each time a new defendant is added. It relies primarily on sec. 801.02(1) and (6), Stats. (1985-86).[23] It contends

[23]Section 801.02, Stats. (1985-86), provides in relevant part:

(1)   A civil action in which a personal judgment is sought is commenced as to any defendant when a summons and a complaint naming the person as defendant are filed with the court, provided service of an authenticated copy of the summons and of the complaint is made upon the defendant under this chapter within 60 days after filing.

. . ..

(6)   Fees payable upon commencement of a civil action shall be paid to the clerk at the time of filing.

that subsection (1) provides that an action is "commenced" against any defendant when the summons and complaint are properly filed and served, and subsection (6) requires the payment of appropriate fees upon such "commencement." As Industrial Coils reads the statute, each time a new defendant is named in an action, that "commences" an action and the appropriate fee must be paid.

Industrial Coils argues that since payment of the filing fee is part of the filing process, and since service before filing results in no action being commenced, *Mech v. Borowski*, 116 Wis. 2d 683, 686–87, 342 N.W.2d 759, 760-61 (Ct. App. 1983) and *Hester v. Williams*, 117 Wis. 2d 634, 640-41, 345 N.W.2d 426, 429-30 (1984), plaintiffs' failure to pay the fee means no action has been commenced against Industrial Coils. We disagree.

Industrial Coils misinterprets sec. 801.02(6) and sec. 814.61(1)(a), Stats. Those sections provide that a filing fee shall be paid at "the" commencement of an action. An action need only be commenced once. The plaintiff need only pay the filing fee once. Nothing in the statutes suggests that the filing fee be collected for each defendant named or added in an action.

Industrial Coils contends that the trial court abused its discretion when it modified the pretrial order to allow plaintiffs to file their third amended complaint. Whether to modify a scheduling or pretrial order is within the trial court's discretion. *Alexander v. Riegert*, 141 Wis. 2d 294, 298, 414 N.W.2d 636, 638 (1987). Industrial Coils

Section 814.61, Stats. (1985-86), provided in relevant part: "In a civil action, the clerk of court . . . shall collect the following fees: (1) . . . (a) At the commencement of all civil actions . . ., $45."

argues that it is an abuse of discretion for a trial court to ignore or misapply statutory law, *Schneider v. Ruch*, 146 Wis. 2d 701, 704–05, 431 N.W.2d 756, 758 (Ct. App. 1988), and that the trial court here failed to act in accord with sec. 802.09(1), Stats.[24]

Just how the trial court failed to act in accord with sec. 802.09(1), Stats., is hardly clear. The statute empowers the court to grant leave to amend without putting a time limit on the power. It directs that "leave shall be freely given at any stage of the action when justice so requires." We find no abuse of discretion.

Moreover, no substantial right of Industrial Coils has been affected by the court's modification of its pretrial order. Industrial Coils has not shown that its ability to present a defense was impaired, that it took any action in reliance on the court's original pretrial order, or that it was harmed in any other way by the modification. Under these circumstances, we could not reverse the order for error. Section 805.18(2), Stats.

## IV.  CONCLUSION

For the reasons stated in this opinion, we conclude that the trial court properly dismissed the plaintiff's claims for strict liability for having conducted an abnormally dangerous activity and for having violated Wis. Adm. Code sec. RD 51, Solid Waste Disposal (1969). The trial court erred to the extent that it dismissed the plain-

---

[24]Section 802.09(1), Stats., provides in relevant part:

A party may amend the party's pleading once as a matter of course at any time within 6 months after the summons and complaint are filed or within the time set in a scheduling order under s. 802.10. Otherwise a party may amend the pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given at any stage of the action when justice so requires.

tiff's claims based upon common law negligence, trespass and nuisance. The trial court erred in holding that the insurance policies exclude coverage. The trial court properly denied the motion of Industrial Coils to dismiss for the failure of the plaintiff to pay a filing fee when adding it as a defendant in an amended complaint and the trial court did not err when it modified its pretrial order.

*By the Court.*—Judgment dismissing plaintiffs' complaint is affirmed in part and reversed in part; judgment dismissing complaint as to the respondent insurance companies is reversed; and orders denying motion of Industrial Coils and modifying pretrial order are affirmed.