Dale VOGEL, and Alice Vogel, Plaintiffs-Respondents-Cross Appellants,†

v.

GRANT-LAFAYETTE ELECTRIC COOPERATIVE, a domestic corporation, and Federated Rural Electric Insurance Corporation, a domestic corporation, Defendants-Appellants-Cross Respondents.

Court of Appeals

*No. 94–0822. Submitted on briefs April 6, 1995.—Decided June 8, 1995.*

(Also reported in 536 N.W.2d 140.)

†Petition to review granted.

200

For the defendants-appellants-cross respondents the cause was submitted on the briefs of *Denis R. Vogel* of *Wheeler, Van Sickle & Anderson, S.C.,* of Madison.

For the plaintiffs-respondents-cross appellants the cause was submitted on the briefs of *Scott Lawrence* of *Lawrence & Des Rochers, S.C.,* of St. Nazianz.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J. The Grant-Lafayette Electric Cooperative and Federated Rural Electric Insurance Corporation (GLEC) appeal, and Dale and Alice Vogel cross-appeal, from a judgment awarding the Vogels $300,000 (reduced to $200,000 for their contributory negligence) for damage to their dairy herd caused by stray electrical voltage.

GLEC claims that the trial court erred in: (1) erroneously submitting the case to the jury on a nuisance theory, thus improperly permitting the Vogels to recover additional damages for "annoyance" and "inconvenience"; (2) failing to confine the Vogels' damages to a specific period of time prior to commencement of the action; (3) denying GLEC's motion for a new trial based on improper remarks of the Vogels' counsel during closing argument to the jury; and (4) denying its motion for a new trial in the interest of justice.

The Vogels' cross-appeal asserts error in the trial court's dismissal of their claim for treble damages under § 182.017(5), STATS.,[1] and its rejection of their argument that, because theirs is an "intentional invasion" nuisance case, principles of comparative negligence should not be applied to reduce their damages.

We conclude that the trial court erred in submitting nuisance issues to the jury and, on remand, we direct the court to strike the separate nuisance-related damages from the verdict and judgment. We reject GLEC's remaining arguments. On the cross-appeal, we conclude that the Vogels are not entitled to treble damages. And because we hold that nuisance theories are

[1] The statute, which will be discussed in greater detail below, provides generally that electric suppliers destroying trees or causing damage to buildings, livestock or other property are liable to the owners for three times actual damages.

inapplicable to this case, we need not consider the Vogels' argument, based on those theories, that it was improper to reduce their gross damages for their contributory negligence.[2]

The basic facts are not in dispute. GLEC, a member-owned cooperative association, operates a distribution system for the transmission and provision of electrical service to its members. It is not a generator of electricity.

The Vogels are members of the cooperative and have owned and operated their farm since 1964. After building a new milking parlor in 1970, they began to notice problems with their cows, including violent behavior, unusually long milking periods and chronic mastitis, which required them to remove a large number of animals from the herd. The Vogels, concerned that these problems were caused by stray voltage on the farm,[3] reported the situation to GLEC in 1986.

---

[2] The Vogels' argument is based on the RESTATEMENT (SECOND) OF TORTS § 822(a) (1979), which imposes liability for a private nuisance occasioned by the intentional and unreasonable invasion of another's land, and *Crest Chevrolet-Oldsmobile-Cadillac, Inc. v. Willemsen*, 129 Wis. 2d 129, 151, 384 N.W.2d 692, 700 (1986), where the supreme court stated that "a comparative fault analysis" was inapplicable to the facts of the case—a claim of intentional nuisance under the Restatement for the intentional diversion of water onto the plaintiff's land. As we conclude below, the nuisance theories set forth in § 822 are inapplicable to this case for there was no "invasion" of the Vogels' property; GLEC was providing a service to the farm that the Vogels had expressly requested.

[3] In past cases, we have described stray voltage as "a natural phenomenon [that] is present on all active [electrical] distribution systems." *Kolpin v. Pioneer Power & Light Co.*, 162 Wis. 2d 1, 10, 469 N.W.2d 595, 598 (1991). Because basic principles of electricity dictate that in order to move power from one

Tests run by GLEC at the time indicated only "normal" levels of voltage in the barn and other areas of the farm frequented by the Vogels' cows.

The Vogels continued to experience problems despite GLEC's attempts to reduce the amount of current flowing into the barn, and they commenced this action in 1992. They sought recovery for loss of milk production and other damages they claimed were caused by stray voltage.

At trial, both sides offered expert testimony as to possible causes of stray voltage on the farm. Dr. Alfred Szews, a professor of electrical engineering with exten-

---

point to another there must be a "completed circuit" from the source to the end use and back again, GLEC's distribution lines carry electricity on two wires: one energized and one neutral. The energized line brings power to the customer and the neutral wire provides a path for a portion of the return current back to the substation. A portion of the return current also can travel back to the substation through the earth.

The Vogel farm has a typical wiring system: two wires energized at 120 volts and a third "neutral" wire are connected to a main electrical panel in the barn which sends electricity to the various "circuits" (containing both "hot" and neutral wires) required for operation of various pieces of equipment common to dairy-farm operations. Grounding rods connected to the neutral wire system are typically driven into the ground near the main panel, and the neutral wires are, by design, connected to metal-work in the barn and other buildings for safety purposes (they provide a current-to-earth path in the event of a short in the system). Because of that attachment, the neutral wires, which invariably carry some electrical current, will transfer some of that current to the metal objects to which they are connected. And this "stray voltage," which can be transmitted to cows coming into contact with metal objects and the earth through which the return current flows, is what the Vogels claim caused the problems with their dairy herd.

sive experience in the field, testified on behalf of the Vogels. He analyzed data that had been gathered at the Vogels' farm several years earlier by the Wisconsin Department of Agriculture and concluded that unreasonable amounts of neutral current had reached the Vogels' cows during the 1970s and 1980s. Szews testified that, in his opinion, GLEC was negligent in maintaining an electrical distribution system that allowed such levels of electrical current to enter the Vogels' barn.

Two members of the Department of Agriculture investigatory team testified for GLEC, offering opinions that the cooperative's electrical line was operating normally and that any excessive stray voltage that might be present was due to a faulty wiring system and other "dangerous conditions" on the Vogels' farm.

The case was eventually submitted to a jury on theories of negligence and nuisance.[4] The jury found that GLEC was negligent and awarded the Vogels general economic damages of $240,000. The jury also found that GLEC had created a nuisance on the Vogels' property and, on the basis of that finding, awarded them an additional $60,000 for "annoyance and inconvenience." Finally, the jury found that the Vogels were contributorily negligent and apportioned 66.66 percent of the negligence to GLEC and 33.33 percent to the Vogels.

Both parties filed postverdict motions. GLEC asked the court to strike the "nuisance" damages and to limit the Vogels' economic damages to a six-year period prior to the commencement of the action. It also sought

---

[4] Prior to trial, GLEC moved in limine to preclude the submission of nuisance as a cause of action and sought to limit the period of time for the Vogels' damages. The trial court denied the motion.

to have various verdict answers changed and moved for a new trial in the interest of justice. The Vogels moved to treble the damages under § 182.017(5), STATS., and to have judgment entered in the full amount of the verdict without any reduction for their contributory negligence. The trial court denied all motions, and the appeal and cross-appeal followed. Additional facts will be referred to in the body of the opinion.

## I. GLEC's APPEAL

### A. *Nuisance*

GLEC argues first that the trial court erred in submitting the case to the jury on the theory that it had maintained a nuisance on the Vogels' property.

■■■■

A trial court has "wide discretion" in instructing the jury, as long as the instructions "accurately reflect the law applicable to the facts of the specific case." *Vonch v. American Standard Ins. Co.*, 151 Wis. 2d 138, 149, 442 N.W.2d 598, 602 (Ct. App. 1989). As is true with all discretionary determinations, however, if the decision is based on an erroneous view of the law it may not stand. *State v. Leist*, 141 Wis. 2d 34, 39, 414 N.W.2d 45, 47 (Ct. App. 1987). We agree with GLEC that, under the facts of this case, the trial court erred as a matter of law when it submitted the nuisance question and instructions to the jury.

■■

A private nuisance is the invasion of a person's interest in the private use or enjoyment of land. *Fortier v. Flambeau Plastics Co.*, 164 Wis. 2d 639, 676, 476 N.W.2d 593, 608 (Ct. App. 1991). *See also* RESTATEMENT (SECOND) OF TORTS § 821D (1979).

In *State v. Deetz*, 66 Wis. 2d 1, 16-18, 224 N.W.2d 407, 415-16 (1974), the supreme court adopted the analysis for determining the existence of a private nuisance which now appears in the RESTATEMENT (SECOND) OF TORTS § 822 (1979) and provides as follows:

> One is subject to liability for a private nuisance if, but only if, [his or her] conduct is a legal cause of an *invasion* of another's interest in the private use and enjoyment of land, and the *invasion* is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

(Emphasis added.)

The text goes on to explain:

> [Nuisance] is not a single type of tortious conduct. The feature that gives unity to . . . private nuisance is the interest *invaded,* namely . . . the private interest in the use and enjoyment of land. These interests may be *invaded* by any one of the types of conduct that serve in general as bases for all tort liability.

RESTATEMENT (SECOND) OF TORTS § 822 cmt. a (1979) (citation omitted) (emphasis added).

GLEC argues that the private nuisance theory is inapplicable because the activity of which the Vogels complain—the provision of electricity to their farm—cannot be considered a nuisance, and our examination of Wisconsin nuisance cases supports that position: the delivery of electricity at the Vogels' request does not, as a matter of law, constitute the type of "invasion" on which nuisance liability is predicated.

210

An examination of nuisance cases illustrates the point. In *Fortier*, 164 Wis. 2d at 676, 476 N.W.2d at 608, we held that toxic chemicals deposited in a landfill which seeped or leached onto the plaintiffs' property and contaminated their well water was the type of "invasion" that would subject the defendants to nuisance liability. Other cases reaching similar conclusions include *Crest Chevrolet- Oldsmobile-Cadillac, Inc. v. Willemsen*, 129 Wis. 2d 129, 384 N.W.2d 692 (1986) (diversion of surface water onto the plaintiff's property); *Krueger v. Mitchell*, 112 Wis. 2d 88, 332 N.W.2d 733 (1983) (excessive noise from an airport interfering with the operation of a neighboring business); *CEW Management Corp. v. First Fed. Sav. & Loan Ass'n*, 88 Wis. 2d 631, 277 N.W.2d 766 (1979) (failure to prevent rainwater and soil runoff caused by stripping of vegetation from entering adjoining lands); and *Jost v. Dairyland Power Coop.*, 45 Wis. 2d 164, 172 N.W.2d 647 (1969) (discharge of sulphur dioxide gases from an electrical generating plant onto adjoining cropland). The common thread in these cases is an "invasion" of the plaintiffs' land: an objectionable activity either undertaken by the defendants or within their control, which has subjected the plaintiffs to an unwanted and harmful interference with the use of their land. In no case has the activity causing the alleged interference been either agreed to or requested by the plaintiffs, as is the situation here.

The Vogels rely heavily on *Prah v. Maretti*, 108 Wis. 2d 223, 321 N.W.2d 182 (1982), where the supreme court held that the owner of a solar-heated home stated a claim for nuisance when he alleged that the proposed construction of a building on an adjoining lot would interfere with his access to sunlight. There is no question that the *Prah* court was expansive in its

definition of the property interests to be protected by the law. It stated, for example:

> Courts should not implement obsolete policies that have lost their vigor over the course of the years. The law of private nuisance is better suited to resolve landowners' disputes about property development in the 1980's than is a rigid rule which does not recognize a landowner's interest in access to sunlight.

*Id.* at 237, 321 N.W.2d at 190.

Despite the *Prah* court's expansive definition of the plaintiff's *interests* protected by the law of nuisance, nothing in the opinion abrogates, or even dilutes, the requirement that there be an *invasion* of property in order for a nuisance to exist under the Restatement rule. GLEC did not unilaterally impose electrical current onto the Vogels' farm; the Vogels requested and paid for its delivery. As users of an instrumentality they invited onto their land, and have in many ways benefited from over the years, we do not think they now may be heard to claim that the instrumentality has illegally "invaded" their property.

We are not persuaded by the Vogels' argument to the contrary: that because GLEC maintained a defective electrical distribution system which allowed their cows to come into contact with stray voltage, it created a nuisance. They have referred us to no case in which the claimed nuisance was a service expressly invited onto the plaintiff's property, and we conclude that it was error to submit the case to the jury on a nuisance theory. It follows that the $60,000 "annoyance and inconvenience" damages awarded by the jury under that theory must be reversed and the total award reduced accordingly.

## B. Limitation of Damages

The Vogels claimed in this action that their stray-voltage problems began with the construction of a new milking parlor in 1970 and continued through 1987, resulting in economic loss to them over that period of time. Prior to trial, GLEC sought to exclude any evidence of damage occurring prior to March 1986, six years prior to the commencement of the action, arguing that such a limitation is appropriate both as a matter of law and on public policy grounds. The trial court denied the motion, and the $240,000 "economic damages" eventually awarded by the jury presumably covered the entire 1970-1987 period. GLEC renews its arguments on appeal, arguing that "upon equitable principles or as a matter of law" we should limit the period of damages, referring us first to the doctrine of laches as support for the duration-of-damage limitation it asks us to impose.

Laches is not a rule limiting the time within which an action may be brought; it is an equitable *defense* to an action based on the plaintiff's unreasonable delay in bringing suit under circumstances in which such delay is prejudicial to the defendant. *Anderson v. Kojo*, 110 Wis. 2d 22, 26-27, 327 N.W.2d 195, 197 (Ct. App. 1982). The rule was developed by chancellors in equity to prevent the assertion of stale claims and to remedy injustices that might arise from the fact that statutes of limitation ordinarily applicable to the assertion of legal rights did not apply in equitable actions. *See Knox v. Milwaukee County Bd. of Elections Comm'rs*, 581 F. Supp. 399, 402 (E.D. Wis. 1984).

Neither the rule itself nor the reasons for its existence have any relation to the case at hand, however,

213

and GLEC has not provided us with any authority applying the rule to limit the period for which damages may be recovered in a timely commenced action. So far as it is grounded on principles of laches, the argument fails.

GLEC next urges us to adopt and apply the "continuous tort" rule, a common-law rule followed in some states dictating that recovery for a "continuous tort" may be had only for such damages as occur within the period of limitations—the period within which the action must be commenced under the applicable statute of limitations. *See Shell Oil Co. v..Parker*, 291 A.2d 64 (Md. App. 1972); *Shors v. Branch*, 720 P.2d 239 (Mont. 1986).

We decline the invitation to adopt such a rule in Wisconsin and refashion it to apply to stray-voltage cases. In *Kolpin v. Pioneer Power & Light Co.*, 162 Wis. 2d 1, 24-25, 469 N.W.2d 595, 604 (1991), the supreme court upheld a judgment for stray-voltage-related damages occurring over a ten-year period. *Kolpin* did not address whether a limit should apply to a plaintiff's damage period.

Finally, GLEC argues that because the "phenomenon" of stray voltage was not "scientifically accepted" until 1979, it should not, as a matter of public policy, be held responsible for damages occurring before that time. We have often said that matters of public policy are to be determined by the supreme court, not this court. *State v. Grawien*, 123 Wis. 2d 428, 432, 367 N.W.2d 816, 818 (Ct. App. 1985). Whether to impose a special limitation period on damages in stray-voltage cases is a question of public policy appropriately left to either the state's legislature or its highest court.

214

## C. Closing Argument

GLEC also argues that it is entitled to a new trial because of improper remarks made by the Vogels' attorney during closing argument.[5] The trial court, concluding that there was no impropriety in counsel's remarks, denied the motion.

As we have discussed above, expert testimony on the nature and cause of stray voltage played a significant role in the trial. During closing argument, counsel for the Vogels stated:

> The most distressing part of [GLEC's] case to me . . . is the extent to which people like Mr. Dasho and Mr. Cook [GLEC's expert witnesses] are willing to basically fabricate evidence to explain away problems away from the utility system. And that's exactly what went on in this [c]ourtroom.... That's a strong statement that those folks fabricated evidence, I recognize that, but frankly, it's [either] that or that they're grossly incompetent is the only explanation for what they came in here and said. I don't say that lightly, but I believe it, I not only believe it, I know it.

Defense counsel objected and the trial court overruled the objection.

There is little question that the argument was improper. "A lawyer shall not . . . assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of

---

[5] The motion was brought under § 805.15, STATS., which authorizes a party to move for a new trial on several grounds, among them "errors in the trial" and "in the interest of justice." GLEC argued to the trial court that it was entitled to a new trial on both grounds based on counsel's remarks.

a cause [or] the credibility of a witness . . . ." SCR 20:3.4 (Lawyers Coop. 1994). Counsel's statement went far beyond simply "drawing inferences from the evidence," as the Vogels maintain. It was plainly intended to convey to the jury that he had evidence that GLEC's expert witnesses were fabricating evidence.

Errors in the course of trial, however, do not always warrant reversal. Only where the error may be said to have prejudiced the complaining party's case are we authorized to reverse.

> [N]ot all errors at trial mandate a reversal. Trial error is prejudicial [and requires reversal] only when it reasonably could be expected to affect the outcome of the case. The general rule . . . is that [an appellate court] will not reverse for error unless it appears probable from the entire evidence that the result would have been different had the error not occurred.

*McCrossen v. Nekoosa-Edwards Paper Co.*, 59 Wis. 2d 245, 264, 208 N.W.2d 148, 159 (1973).

We see no such probability here. First, it is apparent that the jurors believed GLEC's witnesses in large part for, despite counsel's improper statements, they assigned a substantial proportion of the total negligence to the Vogels. Second, the jurors were admonished by the court that they were to be the sole judges of the credibility of all witnesses testifying in the case, and they were instructed as follows with respect to their consideration of counsel's closing arguments:

> You should carefully consider the closing arguments of the lawyers, but their arguments, conclusions and opinions are not evidence. You are

216

to draw your own conclusions and your own inferences from the evidence and answer the questions in the verdict according to the evidence and under these instructions.

We have recognized that " 'possible prejudice ... is presumptively erased from the jury's collective mind when admonitory instructions have been properly given by the court.' " *State v. Kennedy*, 105 Wis. 2d 625, 641, 314 N.W.2d 884, 891 (Ct. App. 1981) (quoting *Roehl v. State*, 77 Wis. 2d 398, 413, 253 N.W.2d 210, 217 (1977)). "We assume that 'a properly given admonitory instruction [will be] followed.' " *State v. Pitsch*, 124 Wis. 2d 628, 644 n.8, 369 N.W.2d 711, 720 (1985) (quoted source omitted).

We conclude, therefore, that while counsel's argument was improper, its effect on the trial was *de minimis* and we see no grounds for reversal. *See Laribee v. Laribee*, 138 Wis. 2d 46, 51, 405 N.W.2d 679, 681 (Ct. App. 1987).

## D. New Trial in the Interest of Justice

As indicated above, GLEC moved after verdict for a new trial in the interest of justice and the trial court denied the motion. It argues on appeal that the denial was "an abuse of discretion" in light of the "overwhelming" evidence demonstrating that the Vogels' damages were caused by their own negligence, not GLEC's.

GLEC correctly states the scope of our review of a trial court's denial of a motion for a new trial in the interest of justice. The trial court's powers in this respect are highly discretionary and we will not reverse absent a "clear" erroneous exercise of that discretion. *Heideman v. American Family Ins. Group*, 163 Wis. 2d

847, 865, 473 N.W.2d 14, 21 (Ct. App. 1991). A court exercises discretion when it considers the facts of record and reasons its way to a rational, legally sound conclusion. *Burkes v. Hales*, 165 Wis. 2d 585, 590, 478 N.W.2d 37, 39 (Ct. App. 1991). And where the record shows that the court looked to and considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach and (b) consistent with applicable law, we will affirm the decision even if it is not one with which we ourselves would agree. *Id.* Indeed, " '[b]ecause the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary decisions.' " *Id.* at 591, 478 N.W.2d at 39 (quoted source omitted).

We are satisfied that the trial court properly exercised its discretion in denying GLEC's new-trial motion. Explaining its reasons for doing so, the court stated:

> I believe that the jury fairly assessed the testimony [it] heard.... I don't think credibility was as important as counsel seems to think. I think . . . the jury found all experts to be credible, and it was simply a question of assessing the amount of negligence that they found to each party here. They did so based on the testimony they heard, and their finding will not be upset. . . . I find in viewing the verdict in the light most favorable to the [Vogels] that the motions are denied.

GLEC has not persuaded us that the trial court's exercise of its discretion to deny the motion was based on an erroneous view of the law, and because the

218

court's explanation of its decision meets all the tests discussed above, we do not disturb the ruling.[6]

## II. THE VOGELS' CROSS-APPEAL

The Vogels argue that they are entitled to treble damages under § 182.017(5), STATS. The trial court, concluding that the statute is inapplicable, rejected the argument, as do we.

Section 182.017(5), STATS., 1991-92,[7] provides as follows:

Any [electric cooperative] which shall in any manner destroy, trim or injure any shade or ornamental trees along any such lines or systems, *or cause any*

---

[6] As noted, we are especially mindful of the rule that the trial court's decision to grant or deny a new trial in the interest of justice is entitled to deference. It is a "highly discretionary" ruling to which we will " 'usually defer[ ] . . . because of the trial court's opportunity to observe the trial and evaluate the evidence . . . .' " *Krolikowski v. Chicago & N.W. Trans. Co.*, 89 Wis. 2d 573, 581, 278 N.W.2d 865, 868 (1979) (quoted source omitted).

Moreover, this is not a case where we would exercise our own discretionary authority under § 752.35, STATS., to order a new trial in the interest of justice, a power we are cautioned to use only "sparingly"—and then only in situations where we are satisfied that a different result is likely on retrial. *Camelot Enters., Inc. v. Mitropoulos*, 151 Wis. 2d 277, 285, 444 N.W.2d 401, 404 (Ct. App. 1989). GLEC's general arguments that the jury's apportionment of negligence was contrary to the great weight of the evidence and that counsel's closing argument was prejudicial (a position we have rejected) have not persuaded us that this is one of those rare cases where relief under § 752.35 is appropriate.

[7] Unless otherwise noted, all references to § 182.017(5), STATS., are to the 1991-92 version of the statute.

*damage to* buildings, fences, crops, *live stock* or other property, except by the consent of the owner ... shall be liable to the person aggrieved in 3 times the actual damage sustained, besides costs.

(Emphasis added.)

Construction of a statute, or its application to a particular set of facts, is a question of law, which we decide independently, owing no deference to the trial court's determination. *Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 853, 434 N.W.2d 773, 778 (1989).

Because our first resort in construing a statute is to the language chosen by the legislature, *State v. Rognrud*, 156 Wis. 2d 783, 787-88, 457 N.W.2d 573, 575 (Ct. App. 1990), where that language is plain on its face, we simply apply it to the facts; we do not look beyond the plain and unambiguous language of a statute. *In re J.A.L.*, 162 Wis. 2d 940, 962, 471 N.W.2d 493, 502 (1991). Where, however, a statute is ambiguous—when it is capable of being understood by reasonably well-informed persons in either of two senses, *Robinson v. Kunach*, 76 Wis. 2d 436, 444, 251 N.W.2d 449, 452 (1977)—we may construe it in light of its history, context, subject matter and scope. *Kluth v. General Casualty Co.*, 178 Wis. 2d 808, 815, 505 N.W.2d 442, 445 (Ct. App. 1993).

We believe that is the case here: that reasonably well-informed people could differ as to whether § 182.017(5), STATS., authorizes treble damages for injuries to livestock in a stray-voltage case. On one hand, it appears quite broad, stating that cooperatives may be liable for treble damages for "caus[ing] any damage to . . . live stock or other property . . . ." The

220

preceding language relating to tree- and brush-trimming and damage to buildings, crops, fences or livestock, however, supports the equally reasonable view that the statute may be limited to such damage as may result from trimming of trees and vegetation along the cooperative's right-of-way.[8] Because the statute is ambiguous, we may look beyond its language and consider its terms in context, and its relation to other statutes, in order to determine the underlying legislative intent.

GLEC argues—correctly, we believe—that considering § 182.017(5), STATS., in context supports the conclusion that it does not apply to the Vogels' claim. Section 182.017 deals generally with acquisition of easements for electric transmission and the construction and maintenance of power lines, poles and towers on the acquired lands. In addition to the provisions at issue here, other portions of the statute regulate the location of lines, poles and towers, authorize the removal of abandoned lines and structures, and generally prohibit power lines from obstructing the public use of highways, bridges or waterways. Section 182.017(2), (3) and (4).

We agree with GLEC that, considering the statute's language in light of its context in the regulatory scheme, it was intended to address physical damage to

---

[8] The ambiguity has since been removed by the legislature, for the statute, as amended by 1993 Wis. Act 371, § 1, now provides:

> Any [electric cooperative] which shall in any manner destroy, trim or injure any shade or ornamental trees along any such lines or systems, or, in the course of tree trimming or removal, cause any damage to . . . livestock . . . shall be liable to the person aggrieved in 3 times the actual damage sustained . . ..

221

trees, buildings, fences or livestock attributable to activities undertaken in the construction, maintenance and abandonment of power lines and related structures within the cooperative's right-of-way, and does not authorize treble damages in cases such as this, which deal with the provision of electric service to the customer.

Our conclusion is bolstered by the existence of a separate statute, § 182.019, STATS., which applies to damages caused by a utility's negligence in the distribution of power to its customers and which contains no provision for treble damages. Were we to construe § 182.017(5), STATS., as the Vogels request, declaring it applicable to GLEC's alleged negligence in delivering electricity to the Vogel farm, the result would be two statutes penalizing the same act, one allowing recovery of actual damages and the other providing for triple recovery—an absurd consequence which would result in discord, rather than harmony, in the statutory scheme. *See Walag v. Town of Bloomfield*, 171 Wis. 2d 659, 663, 492 N.W.2d 342, 344 (Ct. App. 1992) (statutes must be read to avoid absurd results); *State v. Fouse*, 120 Wis. 2d 471, 477, 355 N.W.2d 366, 369 (Ct. App. 1984) (statutory provisions appearing to conflict are to be construed harmoniously). Beyond that, the legislative history of the two statutes confirms our conclusion.[9] Section 182.017(5) does not authorize treble damages in stray-voltage cases.

---

[9] As originally enacted, §§ 182.017(5) and 182.019, STATS., were part of the same paragraph of the same statute, § 1778, STATS., 1905, which provided as follows:

> Any [electric utility] . . . shall be liable for all damages occasioned by . . . negligence . . . in . . . the furnishing of power to its patrons for public purposes. Nothing contained in this act shall authorize or empower such [utility] to in any manner destroy, trim or . . . injure

We reverse the judgment insofar as it awards the Vogels $60,000 damages for "annoyance and inconvenience" based on a nuisance theory of liability, and we remand to the trial court with directions to delete that portion of the judgment. In all other respects, we affirm.

any . . . trees along any such lines . . . except by consent of the owner.

Laws of 1905, ch. 304, § 1.

As may be seen, the first sentence of the 1905 statute related to damage caused by the utility's negligence in delivering power to its customers and the second to damage occasioned by the trimming of trees and other activities along power line rights-of-way. The second sentence was amended shortly thereafter to add the following language: "or cause any damage to buildings, fences, crops, live stock or other property except by the consent of the owner . . . ." Laws of 1905, ch. 505, § 1. The sentence (as amended) went on to state that violation of "the provisions of this section" shall be subject to treble damages. Laws of 1905, ch. 505, § 1.

The two provisions—one dealing with liability for negligence "in the furnishing of power" and the other dealing with damage to buildings, fences and livestock in connection with trimming operations along the rights-of-way—were subsequently made into separate subsections of the statute. See § 1778, STATS., 1911. Today, as discussed above, they exist as separate statutes, with only the "tree-trimming" provisions relating to damage to "buildings, fences, crops, live stock or other property," i.e., § 182.017(5), STATS., containing the treble-damage clause.

The history of the statute thus provides additional evidence of the legislature's intent to limit treble damages to acts related to injuries arising from the construction and maintenance of power lines and power line rights-of-way, § 182.019, STATS., and not to impose them for the cooperative's negligence in the actual delivery of power, § 182.017(5), STATS.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.