NORTHRIDGE COMPANY, a partnership, Southridge Company, a partnership, Sidney Kohl, as Trustee under the Sidney Kohl 1985 Trust, Allen Kohl, 1984 Trust, Herbert Kohl, Dolores Kohl Solovy, The Dolores Kohl Educational Foundation, Inc., The Taubman Realty Group Limited Partnership, a Massachusetts Limited Partnership, Elliot M. Siegel, as Trustee under the Elliot M. Siegel 1985 Trust, Melodee Siegel Kornacker, as Trustee under the Melodee Siegel Kornacker Trust, Angela W. Siegel, as Trustee under Trust A, Angela W. Siegel, as Trustee under Trust B, Sidney Kohl, as Trustee under the Sidney A. Kohl 1985 Trust, Dolores Kohl Solovy and Ralph Loewenberg, as Trustees under the Allen Kohl 1974 Trust, F/B/O Daniel Kohl, F/B/O Elizabeth Kohl, F/B/O David Kohl, F/B/O Michael Kohl, Jerold Solovy, as Trustee under the Lawrence Kohl Family Trust, Jerold Solovy, as Trustee under the Robert Kohl Family Trust, and Elliot M. Siegel, as Trustee under the Elliot M. Siegel 1985 Trust, Plaintiffs-Respondents-Cross Appellants,

v.

W. R. GRACE & COMPANY, Defendant-Appellant-Cross Respondent. [Case No. 95-1193] †

NORTHRIDGE COMPANY, a partnership, Southridge Company, a partnership, Sidney Kohl, as Trustee under the Sidney Kohl 1985 Trust, Allen Kohl, 1984 Trust, Herbert Kohl, Dolores Kohl Solovy, The Dolores

---

†Petition to review denied.

Kohl Educational Foundation, Inc., The Taubman Realty Group Limited Partnership, a Massachusetts Limited Partnership, Elliot M. Siegel, as Trustee under the Elliot M. Siegel 1985 Trust, Melodee Siegel Kornacker, as Trustee under the Melodee Siegel Kornacker Trust, Angela W. Siegel, as Trustee under Trust A, Angela W. Siegel, as Trustee under Trust B, Sidney Kohl, as Trustee under the Sidney A. Kohl 1985 Trust, Dolores Kohl Solovy and Ralph Loewenberg, as Trustees under the Allen Kohl 1974 Trust, F/B/O Daniel Kohl, F/B/O Elizabeth Kohl, F/B/O David Kohl, F/B/O Michael Kohl, Jerold Solovy, as Trustee under the Lawrence Kohl Family Trust, Jerold Solovy, as Trustee under the Robert Kohl Family Trust, and Elliot M. Siegel, as Trustee under the Elliot M. Siegel 1985 Trust, Plaintiffs-Appellants,

v.

W. R. GRACE & COMPANY, Defendant-Respondent.
[Case No. 95-2035]†

Court of Appeals

*Nos. 95–1193, 95–2035. Oral argument April 11, 1996.—Decided September 12, 1996.*

(Also reported in 556 N.W.2d 345.)

†Petition to review denied.

269

For the plaintiffs-appellants and the plaintiffs-respondents-cross appellants the cause was submitted on the briefs of *Speights & Runyan*, with *C. Alan Runyan* and *Amanda G. Steinmeyer*, of Hampton, South Carolina.

For the plaintiffs-respondents-cross appellants a response was filed by *Michael, Best & Friedrich*, with *John A. Busch*, *Paul F. Linn*, and *Peter K. Richardson*, of Milwaukee; oral argument by *John A. Busch*.

For the defendant-respondent and the defendant-appellant-cross respondent there were briefs by *O'Neil, Cannon & Hollman, S.C.*, with *Thomas G. Cannon*, *Dean P. Laing*, and *Gregory W. Lyons* of Milwaukee; oral argument by *Thomas G. Cannon*.

Before Fine and Schudson, JJ., and Michael T. Sullivan, Reserve Judge.

SCHUDSON, J.   W. R. Grace & Company (Grace) appeals from the trial court's denial of its post-verdict motions for judgment or, in the alternative, for a new trial. Northridge Company, Southridge Company, their individual partners, and the Taubman Realty Group Limited Partnership (collectively, "Northridge") cross-appeal from the trial court's reduction of the verdict by twenty percent. Northridge also cross-appeals from the trial court's order denying photocopying costs, double costs, and pre-verdict interest.

271

On the appeal, we affirm on all issues. On the cross-appeal, we reverse in part, concluding that the trial court erred in reducing the jury's award by twenty percent, and affirm on all other issues.

## I. BACKGROUND

This is the second appeal stemming from Northridge's action against Grace. In the first appeal, on bypass from the trial court, the supreme court reversed the trial court's dismissal of Northridge's complaint. The supreme court summarized the factual background:

> [Northridge] filed a complaint against [Grace], alleging breach of warranty and several tort claims based on the defendant's sale of Monokote,[1] a fireproofing material, to the plaintiffs' general contractor[2] for use in the construction of the plaintiffs' shopping centers. The complaint alleges that the Monokote was in a defective condition and, because it contains asbestos, presented unreasonable danger to persons and property. The plaintiffs assert that the asbestos contaminated the building and they suffered damages by incurring expenses for inspection, testing and removal of

---

[1] The supreme court decision refers to "Monokote." The record before us, however, refers to "Monokote-3" as the product involved in this case. The record further clarifies that there are other "Monokote" products, including "Monokote-4," which do not contain asbestos. Consistent with the supreme court's decision, however, we will refer to "Monokote" (except in quotations) with the understanding that in this decision "Monokote" is synonymous with "Monokote-3."

[2] The general contractor was The Taubman Company, a subsidiary of the Taubman Realty Group Limited Partnership, one of the appellants in this case.

Monokote and by a diminished value of the property.

*Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 922, 471 N.W.2d 179, 180 (1991). The supreme court rejected the trial court's determination that the alleged damages were "solely economic losses unrelated to any physical harm to property." *Id.* The supreme court concluded:

> [T]he complaint in this case can be interpreted as alleging that a defect in the product has caused physical harm to property, property other than the product itself. The alleged physical harm to other property consists of the contamination of the plaintiffs' building with asbestos from the defendant's product, posing a health hazard. Accordingly we conclude that the complaint states a tort claim for relief in strict products liability and negligence.

*Id.*, 162 Wis. 2d at 923, 471 N.W.2d at 180. In a footnote, the supreme court also explained:

> [Grace] argues that [Northridge's] claims in nuisance, deceit, strict liability for misrepresentation, and negligent misrepresentation are barred because [Northridge has] not suffered physical harm to property. Because we conclude that [Northridge has] alleged physical harm to property rather than solely economic loss, [Grace's] argument has no merit.

*Id.*, 162 Wis. 2d at 938 n.15, 471 N.W.2d at 187 n.15.[3]

---

[3] The supreme court also concluded that because Northridge "did not allege privity" in the complaint, the "claim for breach of warranty must therefore be dismissed."

At the trial following remand from the supreme court, Northridge pursued its theories of strict liability, negligence, misrepresentation, and nuisance, and sought compensatory damages for: (1) the approximate $900,000 cost of removing some of the Monokote from the shopping malls prior to their sale in 1988; and (2) the $10 million discount given to the purchaser of the shopping malls to cover the remaining cost of abatement. Northridge also sought punitive damages.

At the conclusion of a five-week trial, the jury returned special verdicts finding that Monokote was not defective when it left Grace's possession so as to unreasonably endanger a prospective user or the user's property. The jury further found that although Grace made an untrue representation that Monokote was safe, Grace did not knowingly or recklessly make that misrepresentation. The jury found, however, that Grace was negligent and that Grace's negligence caused Northridge's injuries. The jury further found that Northridge was twenty percent contributorily negligent. The jury also found that Monokote did contaminate the shopping malls and create a health hazard to their occupants prior to April 4, 1988, the date the shopping malls were sold, and that on or before that date, Monokote constituted a nuisance or was reasonably certain to become a nuisance. The jury awarded Northridge $4,830,000 in compensatory damages.

Grace moved for judgment notwithstanding the verdict or for a change of answer or, in the alternative, for a new trial. Grace maintained that no credible evidence supported the verdicts and, alternatively, that the jury's findings were contrary to law and the

*Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 938 n.15, 471 N.W.2d 179, 187 n.15 (1991).

274

weight of the evidence. The trial court denied Grace's motions. The trial court then granted Grace's motion to reduce the judgment by twenty percent—from $4,830,000 to $3,864,000—based on the application of the jury's contributory negligence finding to the nuisance verdict. The trial court denied Northridge's motions for double costs and photocopying costs. The judgment clerk perfected the judgment that, with the addition of taxable costs, totaled $4,010,667.62.

## II. GRACE'S APPEAL

Grace argues that: (1) no credible evidence established the existence of a health hazard prior to April 4, 1988, the day on which the Northridge owners sold the shopping centers; (2) no credible evidence established that abatement of asbestos contamination was the basis for the $10 million discount to the purchaser of the shopping malls; (3) the jury's findings regarding both the health hazard and the $10 million discount were against the great weight and clear preponderance of the evidence; and (4) the cause of action for nuisance was insufficient as a matter of law because the shopping malls were not owned by or in possession of Grace.[4]

---

[4] Grace also argued that under *Vogel v. Grant-Lafayette Elec. Co-op.*, 195 Wis. 2d 198, 536 N.W.2d 140 (Ct. App. 1995), the nuisance claim was insufficient because Northridge "invited" the contaminants on its properties. The supreme court, however, recently reversed *Vogel, see* 201 Wis. 2d 416, 548 N.W.2d 829 (1996), and, as a result, by its June 12, 1996 letter to this court, Grace withdrew this additional argument.

## A. The Sufficiency of the Evidence

"When there is *any* credible evidence to support a jury's verdict, 'even though it be contradicted and the contradictory evidence be stronger and more convincing, nevertheless the verdict . . . must stand.' " *Weiss v. United Fire & Casualty Co.*, 197 Wis. 2d 365, 389-390, 541 N.W.2d 753, 761-762 (1995) (emphasis in original; citations omitted). "Only in the rare case, where the facts are undisputed and the required verdict is absolutely clear, should the trial court reverse the jury's conclusion." *Macherey v. Home Ins. Co.*, 184 Wis. 2d 1, 8, 516 N.W.2d 434, 436 (Ct. App. 1994). In this case, the trial court correctly concluded that the evidence was sufficient.

Question 13 of the special verdict asked:

> Did the Monokote-3 manufactured by the defendant, W.R. Grace & Co., contaminate the Northridge and Southridge Malls by *releasing toxic substances into the environment and thereby causing damage to the malls and a health hazard to their occupants prior to April 4, 1988*?

(Emphasis added.) The jury answered, "Yes." Grace argues that Northridge "failed to present any evidence of a present health hazard prior to [April 4, 1988]." Grace's argument derives from an apparent misunderstanding of what Northridge was required to prove to establish "a health hazard," and from a very selective review of the evidence.

The phrasing of the jury question was consistent with the supreme court's phrasing of "[t]he essence" of the Northridge claim that it found legally viable: "that Monokote *releases toxic substances in the environment thereby causing damage to the building and a health*

276

*hazard to its occupants." Northridge,* 162 Wis. 2d at 937, 471 N.W.2d at 186 (emphasis added). The supreme court explained that, under Northridge's theory, "[t]he alleged physical harm to other property consists of the contamination of the plaintiffs' buildings with asbestos from the defendant's product, *posing a health hazard." Id.* at 923, 471 N.W.2d at 180 (emphasis added). A "hazard" is, *inter alia,* "a possible source of peril, danger." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1041 (1976). Thus, contrary to Grace's theory, Northridge was not required to prove that anyone suffered actual health injury resulting from asbestos prior to the date the malls were sold. Consistent with the exact phrasing of both the supreme court's decision and the jury question, Northridge was required to prove that Monokote contaminated the shopping malls by releasing toxic substances prior to April 4, 1988 and, as a result, caused a health hazard.

Northridge did so. The evidence in this lengthy trial was voluminous. It provided many substantial bases on which the jury could reach its verdict on this issue. Most directly, Sidney Kohl, Northridge's managing partner, testified that in 1986 he was advised that inspections had detected that demolition and remodeling in the malls released large amounts of asbestos particles that were dangerous to those doing the remodeling[5] and others near the work site. Howard Spielman, an industrial hygienist, testified that asbestos removal was necessary because tenant turnover would result in renovations that, in turn, would result in the release of asbestos. Thus, Kohl testified:

---

[5] Grace does not challenge the jury instruction explaining that the shopping mall "occupants" include maintenance and construction workers as well as customers and clerks.

277

It is my position that when Northridge and Southridge by its very nature of its use gets remodeled and tenants move in and out—and when tenants move in and out they have to demolish and renovate the premises. When they do that . . . the asbestos gets dislodged and it becomes a hazard and it has to be removed.

Contrary to Grace's argument, evidence established that such "dislodged" asbestos posed health hazards. A brief sampling includes: Grace's own internal documents describing its efforts to locate a substitute for Monokote because "[a]sbestos is a health hazard," and observing that "[a]sbestos is rapidly becoming recognized as a very serious health hazard;" testimony of Dr. Henry Anderson, an epidemiologist, that asbestos can cause disease and is the highest level of carcinogen, and further, that the disturbance of friable asbestos-containing material from sprayed asbestos such as Monokote was hazardous to those who would breathe the air during its disturbance;[6] and testimony of Spielman that the asbestos-containing fireproofing at the Northridge mall was moderately friable and that its debris was present at a remodeling site, and that the fireproofing material at the Southridge mall was moderately to quite friable and easily dislodged and was periodically disturbed during remodeling. The evidence was overwhelming.[7]

---

᠙ [6] This, among other things, would seem to counter Grace's counsel's assertion at oral argument that although there was evidence of the danger of asbestos generically, there was no evidence that a "wet cementicious" substance such as Monokote posed a health hazard.

[7] We are not the first to reach such a conclusion. In another case involving Grace and Monokote contamination, the Fourth Circuit Court of Appeals commented that "the evidence was

278

■

Grace's argument challenging the evidence of the $10 million discount is equally misguided. Grace contends that the "testimony clearly shows that the alleged $10 million discount was not caused by the contamination to the shopping centers, but rather was the result of economic concerns only." Again, Grace misinterprets the law and selectively reviews the evidence.

---

sufficient to support a finding that Grace knew of the risks associated with Monokote," and further explained:

> The evidence showed that as early as 1969, Grace had begun searching for an acceptable substitute for asbestos in Monokote. Grace's desire to eliminate asbestos from the Monokote formula arose, in part, in reaction to growing public concern over the dangers of exposure to asbestos. In 1969, a Grace official attended a lecture given by a noted asbestos researcher and prepared a report summarizing the contents of the lecture. The report stated:
>
>> After noting the widespread concentration of [asbestos] fibers around major office structures, . . . [the lecturer] stressed the hazards to the general public of this pollution of the air. Also, he noted the concern of possible long-term danger to building occupants from prolonged minute dusting of fibers through the building's air distribution systems.
>
> The report characterized the charges concerning the dangers of asbestos exposure as "very serious," and it noted that "responsible people are listening all across the country."
> By April 1970, Grace had developed and begun testing two asbestos-free Monokote formulas. Later that year, Grace prepared a report dealing with its research and development program for asbestos-free Monokote. The report noted that the performance of the asbestos-containing Monokote was "questionable," both because of the health risks associated with asbestos, and because the Monokote often failed to bond properly to the surfaces to which it was applied.

*City of Greenville v. W. R. Grace & Co.*, 827 F.2d 975, 981 (4th Cir. 1987).

279

Grace's argument derives from its presupposition that contamination costs and what it terms "economic concerns" are strictly separable. The supreme court, however, implicitly rejected just such a separation:

> While economic loss is measured by repair costs, replacement costs, loss of profits, or diminution of value, the measure of damages does not determine whether the complaint is for physical harm or economic loss. In other words, the fact that the measure of the plaintiffs' damages is economic does not transform the nature of its injury into a solely economic loss. Physical harm to property may be measured by the cost of repairing the buildings to make them safe.

*Northridge*, 162 Wis. 2d at 931-932, 471 N.W.2d at 184 (citations omitted).

Grace maintains that "[n]o witness, including Sidney Kohl and Kelley Bergstrom, the two principals that negotiated the sale of the shopping centers for their respective parties, testified that the contamination of the shopping centers by the Monokote-3 in any way caused or contributed to the alleged $10 million discount." The record belies Grace's claim.

Kohl testified that "to accommodate new leases," renovation work at the malls "almost always involves removal and/or modification of the walls, suspended ceilings, lighting, electrical, HVAC and/or plumbing." He explained that because the asbestos "is sure to be disturbed" with each renovation, "it is managerially prudent and cost effective to eliminate the [asbestos] problems as the opportunities present themselves." Kohl testified that although substantial asbestos removal had been completed by the time the malls were

sold, considerably more was left to be done. Thus, he explained, after negotiating the purchase price, the parties entered into additional negotiations concerning payment for the remaining asbestos removal. Bergstrom testified and confirmed that the parties negotiated the asbestos removal as "a separate item," that the asbestos removal costs affected the purchase price because the purchaser "would be required to take out most of the asbestos," and that the $10 million discount was a condition of the sale. Clearly, the Kohl and Bergstrom descriptions of the negotiations establish that the parties agreed the purchaser would be responsible for the remaining asbestos removal in exchange for a $10 million discount in the purchase price.

With respect to both the contamination/health hazard issue and the $10 million discount issue, Grace also argues for a new trial contending that the jury's findings are against the great weight and clear preponderance of the evidence. In support of this argument, Grace merely re-wraps the challenges we have just discussed. We see no basis for a new trial; the evidence supports the jury's verdicts.

## B.   The Nuisance Claim

■ Grace argues that "[t]he trial court erred as a matter of law in refusing to dismiss plaintiffs' nuisance claim" because it did not own the shopping malls and, Grace contends, "[t]he law in Wisconsin is clear that a nuisance claim fails . . . where the alleged tortfeasor no longer owns or controls the nuisance-causing property." Grace is wrong.

More than one hundred years ago the supreme court held that "one who has erected a nuisance will be

responsible for its continuance, even after he has parted with the title and the possession . . . ." *Lohmiller v. Indian Ford Water-Power Co.*, 51 Wis. 683, 689, 8 N.W. 601, 602 (1881). Many years later, rejecting an argument comparable to Grace's, the supreme court reiterated, " 'The fact that the defendant cannot enter to abate the nuisance does not excuse his liability, for it is his own wrong which has involved him in trouble.' " *Kamke v. Clark*, 268 Wis. 465, 470, 67 N.W.2d 841, 843 (citation omitted) (the fact that brewing company had no right to enter public dump site to abate nuisance did not preclude judgment of abatement where company's acts contributed to cause of nuisance), *rehearing denied*, 268 Wis. 478a, 68 N.W.2d 727 (1955). More recently, in *Fortier v. Flambeau Plastics Co.*, 164 Wis. 2d 639, 476 N.W.2d 593 (Ct. App. 1991), this court concluded that manufacturers can be liable for nuisance long after they relinquish ownership or control over their polluting products.[8] *Id.* at 676, 476

---

[8] *Fortier v. Flambeau Plastics Co.*, 164 Wis. 2d 639, 476 N.W.2d 593 (Ct. App. 1991), noted that Wisconsin has adopted the analysis of private nuisance articulated in § 822 of the RESTATEMENT (SECOND) OF TORTS (1977). *Fortier*, 164 Wis. 2d at 676, 476 N.W.2d at 608. That section provides:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Further, comment e to § 834 of the RESTATEMENT (SECOND) OF TORTS provides:

> [I]f the activity has resulted in the creation of a physical condition that is of itself harmful after the activity that created it has ceased, a person who carried on the activity that created the condition or

N.W.2d at 608 (suit against manufacturers for deposit of hazardous material in city landfill). Clearly, Wisconsin law allows for Northridge's nuisance claim.

Therefore, we affirm the trial court on all issues in this appeal.

## III. NORTHRIDGE'S CROSS-APPEAL

Northridge cross-appeals[9] arguing that the trial court erred in: (1) reducing its damages award by twenty percent; (2) denying costs to cover photocopying expenses; and (3) concluding that the judgment did not exceed the Northridge settlement offer and, therefore, denying double costs and prejudgment interest. All three arguments raise issues subject to our *de novo* review. *Ball v. District No. 4 Area Bd.*, 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984) (issues of law reviewed *de novo* on appeal).

### A. The Twenty Percent Reduction

The trial court reduced the judgment for Northridge by twenty percent based on the jury's finding that Northridge was twenty percent contributorily negligent. Northridge argues that the

who participated to a substantial extent in the activity is subject to liability for a nuisance, for the continuing harm. . . . This is true even though he is no longer in a position to abate the condition and to stop the harm.

[9] Some of the issues of the cross-appeal were presented to this court in Appeal No. 95-2035. On July 24, 1995, this court denied Grace's motion to supplement the record in a manner that effectively could have consolidated the two appeals. As a practical matter, however, the two appeals came to be considered together and, at oral argument, the parties confirmed this court's understanding that all the issues in the two appeals should be decided together.

trial court erred because the jury's finding of contributory negligence related to its verdicts on the negligence claim where Grace prevailed, not on the nuisance claim where the jury found for Northridge. Northridge further contends that even if, in theory, a contributory negligence finding could be grafted to a nuisance verdict, Grace waived any arguable right it otherwise might have had to a reduced judgment by failing to timely pursue this theory in the trial court, and by failing to seek jury instructions or verdict forms reflecting such an application. Finally, Northridge also maintains that the trial court lacked jurisdiction to even entertain Grace's request because Grace failed to move for the reduction of the judgment within twenty days, as required by § 805.16(1), STATS.[10]

The trial court accepted Grace's argument that a motion was not required within twenty days because Grace was merely requesting the trial court to carry out its ministerial duty to enter judgment on the verdict. We conclude, however, that Grace's request to reduce raised substantial factual and legal issues and, therefore, required a motion under § 805.16(1), STATS. Thus, the trial court erred in reducing the judgment.

As Northridge points out, Grace never argued that its contributory negligence defense applied to Northridge's nuisance claim until it requested reduction of the judgment. Throughout this protracted litigation, Grace always confined its contributory negligence theory of defense to the negligence claim. Thus, the trial court never considered whether

---

[10] Section 805.16(1), STATS., provides:

Motions after verdict shall be filed and served within 20 days after the verdict is rendered, unless the court, within 20 days after the verdict is rendered, sets a longer time by an order specifying the dates for filing motions, briefs or other documents.

contributory negligence could apply to a nuisance claim and, if so, whether negligent nuisance and intentional nuisance would have to be distinguished. Grace never requested instructions or verdict forms that would have provided for the jury to consider such issues.

The wording and sequence of the jury verdicts demonstrate the apparent separation of the contributory negligence finding from the nuisance finding. Question 3 asked, "Was W.R. Grace & Co. negligent?" The jury answered, "Yes." Question 4 then asked, "If you answered 'yes' to question 3, then answer this question: Was such negligence a cause of the plaintiffs' injuries?" The jury answered, "Yes." Question 5 then asked, "If you answered 'yes' to Question 2[11] and/or 4, then answer this question: Were the plaintiffs negligent?" The jury answered, "Yes." The jury then answered Question 6 and Question 7, finding that Northridge's negligence was 20% causal.

Then, after five questions on the misrepresentation issues and one question on the contamination issue, Question 14 asked, "On or before April 4, 1988, was the Monokote-3 in the Northridge and Southridge malls a nuisance or reasonably certain to become a nuisance?" The jury answered, "Yes." The next question asked the jury to determine the sum of money to compensate Northridge, and the final two questions related to the issues of outrageous conduct and punitive damages. No question asked the jury to consider whether Northridge might be contributorily negligent on the nuisance claim. No question stated or implied in any way that the Question 5 inquiry about

[11] Questions 1 and 2 related to whether Monokote-3 was a defective product when it left Grace's possession, unreasonably endangering a user, consumer, or its property. The jury responded in the negative.

285

Northridge's negligence extended beyond its explicit range: "If you answered 'yes' to Question 2 and/or 4."

Thus, contrary to Grace's assertion that it was merely asking the trial court to fulfill its duty to enter judgment on the verdicts, Grace's request for the reduction raised substantial issues requiring careful analysis of the trial record, the jury instructions, the wording and sequence of the verdicts, and legal issues of Grace's possible waiver, and of the relationship between contributory negligence and both negligent and intentional nuisance.[12]

Under § 805.16(1), STATS., "motions after verdict must be filed and served within twenty days after the verdict is rendered" unless the trial court extends the time. *Schmidt v. Smith*, 162 Wis. 2d 363, 370, 469 N.W.2d 855, 857-858 (Ct. App. 1991). As we have emphasized:

> Section 805.16, STATS., provides fair warning that a litigant who fails to make timely motions after verdict acts at his or her peril.
>
> . . . .
> . . . Section 805.16 was designed to avoid unnecessary protraction of litigation. Strictly construing that section will help to accomplish that purpose.

*Id.*, 162 Wis. 2d at 372-373, 469 N.W.2d at 858 (citations omitted). The jury returned verdicts on December 21, 1994. The trial court did not extend the

---

[12] That this remains a significant, unresolved legal issue was confirmed when the supreme court recently identified but declined to "address the issue of whether a nuisance based on an intentional invasion is subject to a contributory negligence defense." *Vogel*, 201 Wis. 2d at 434 n.6, 548 N.W.2d at 837 n.6.

time for filing motions. Grace requested the reduction of the judgment on March 2, 1995, more than two months later. Under § 805.16(1), a timely motion was required and, therefore, the trial court erred in granting Grace's request to reduce the judgment.[13]

## B.  Photocopying Costs

Northridge also argues that the trial court erroneously exercised discretion in determining whether to award costs for photocopying expenses. Northridge submitted a bill of costs that included $59,026.74 for photocopying expenses. After the clerk refused to include the photocopying costs in the total judgment, Northridge moved the trial court to review the matter. Grace responded that the clerk simply had followed the "long-standing policy of the Milwaukee County Clerk of Court's office to disallow taxation of all photocopying costs to all parties in all cases on the grounds that taxable costs are not synonymous with costs of litigation." The trial court deferred to that policy and denied Northridge's request.

---

[13] At oral argument Grace also contended that entry of the reduced judgment was "automatic by operation of law" and, in both argument and brief, maintained that, under § 805.14(5)(a), STATS., no motion was required. Section 805.14(5)(a), provides:

> A motion for judgment on the verdict is not required. If no motion after verdict is filed within the time period specified in s. 805.16, judgment shall be entered on the verdict at the expiration thereof. If a motion after verdict is timely filed, judgment on the verdict shall be entered upon denial of the motion.

We do not read this statute to undermine the clear mandate of § 805.16(1), STATS. We share Northridge's view that, read in context, § 805.14(5)(a) relieves a *prevailing* party from the need to move for judgment on the verdict.

Northridge relies on this court's decision in *Zintek v. Perchik*, 163 Wis. 2d 439, 471 N.W.2d 522 (Ct. App. 1991). The supreme court, however, recently concluded that *Zintek* "incorrectly interpreted [§§ 814.04(2) and 814.036, STATS.], and ignored their plain meaning," and held that photocopying costs are not taxable, except " 'for certified copies of papers and records in any public office,' " pursuant to § 814.04(2). *Kleinke v. Farmers Coop. Supply & Shipping*, 202 Wis. 2d 138, 148-149, 549 N.W.2d 714, 718 (1996). Thus, under *Kleinke*, we affirm the trial court's denial of photocopying costs.[14]

### C.   Double Costs

Finally, Northridge argues that its pretrial offer to settle the case for $4.9 million "with costs" was for an amount less than the judgment and, therefore, that it was entitled to double costs and prejudgment interest. Northridge calculates: (1) when the twenty percent of the jury award of $4,830,000 is restored to the $3,864,000 judgment, and the $146,667.62 costs actually awarded are added, the total judgment is $4,976,667.62; and (2) when the $1,878.81 taxable costs as of the date the offer of settlement was made are added to the $4.9 million pretrial offer, the total offer "with costs" is $4,901,878.01. Thus, Northridge computes, the judgment was $74,788.82 more than its offer.

Under § 807.01, STATS.,[15] Northridge offered to settle the case for "$4,900,000, with costs." Thus, Northridge's theory prevails if the words "with costs" in

---

[14] The record reflects that Northridge submitted a bill of costs listing $59,026.74 under "Photocopies" but listing no additional amount under "Certified Copy of."

[15] Section 807.01, STATS., in relevant part, provides:

its offer and in § 807.01(3) mean that the costs actually awarded are to be added to the verdict amount before comparing it to the offer plus the taxable costs actually incurred as of the date of the settlement offer.

In *Stahl v. Sentry Insurance*, 180 Wis. 2d 299, 509 N.W.2d 320 (Ct. App. 1993), we concluded that "with costs" means "in addition to costs." *Id.* at 307, 509 N.W.2d at 323. Northridge argues, however, that in *American Motorists Insurance Co. v. R & S Meats, Inc.*, 190 Wis. 2d 196, 526 N.W.2d 791 (Ct. App. 1994), we referred to whether "the total judgment, *including costs*, meets or betters the offer of settlement." *Id.* at 214-215, 526 N.W.2d at 798 (emphasis added). That reference, however, was explicitly limited to "[t]he question of whether interest awarded under § 807.01(4), STATS., is allowed on double costs awarded pursuant to § 807.01(3)." *Id.* at 213, 526 N.W.2d at 798." Thus, *American Motorists* addresses an issue regarding *interest* under § 807.01(4), while *Stahl* addresses an issue regarding *costs* under § 807.01(3). *See also Blank v. USAA Property & Casualty Ins. Co.*, 200 Wis. 2d 270, 282, 546 N.W.2d 512, 517 (Ct. App. 1996) (further clarifying that *American Motorists* addressed *interest* under § 807.01(4)).

---

(3) After issue is joined but at least 20 days before trial, the plaintiff may serve upon the defendant a written offer of settlement for the sum, or property, or to the effect therein specified, with costs. . . . If the offer of settlement is not accepted and the plaintiff recovers a more favorable judgment, the plaintiff shall recover double the amount of the taxable costs.

(4) If there is an offer of settlement by a party under this section which is not accepted and the party recovers a judgment which is greater than or equal to the amount specified in the offer of settlement, the party is entitled to interest at the annual rate of 12% on the amount recovered from the date of the offer of settlement until the amount is paid. . . .

Thus, we conclude that *Stahl* governs this issue and requires that, under § 807.01(3), STATS., the offer and the judgment must be compared exclusive of any costs. Therefore, Northridge's offer of $4,900,000 exceeded the judgment of $4,830,000 and, accordingly, we affirm the denial of double costs.[16]

Therefore, on the cross-appeal, we affirm on all issues except that involving the twenty percent where we reverse and remand for entry of judgment for Northridge in the amount of $4.83 million, plus costs and interest as allowed under § 814.04, STATS.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions; order affirmed.

SULLIVAN, J. (*concurring in part; dissenting in part*). I wholeheartedly agree with the majority opinion with respect to the issues raised in W. R. Grace & Company's appeal. I also agree with the majority opinion with respect to Northridge Company's cross-appeal on the issues of photocopying costs, double costs, and pre-verdict interest.

I firmly disagree, however, with the majority's reversal of the trial court's reduction of the jury award by Northridge's contributory negligence. Accordingly, I respectfully dissent on that issue.

The majority concludes "the trial court erred in granting Grace's request to reduce the judgment"

---

[16] Because we affirm on this basis, we need not address Grace's argument that Northridge is not entitled to double costs because it presented a single offer on behalf of multiple plaintiffs. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

because Grace did not timely move under § 805.16(1), STATS., to reduce the jury's damage award. Majority op. at 284. The majority has inappropriately shifted the burden on challenging the jury verdict to Grace.

The special verdict questions were approved by both parties before they were submitted to the jury. Thus, any challenge to those verdict questions was waived. *See, e.g.*, John A. Decker & John R. Decker, *Special Verdict Formulation in Wisconsin*, 60 MARQ. L. REV. 201, 269-71 (1977) (discussing role of waiver in special verdict conference). As the majority points out, the jury gave the following answers to the approved verdict questions:

> Question 3 asked, "Was W.R. Grace & Co. negligent?" The jury answered, "Yes." Question 4 then asked, "If you answered 'yes' to question 3, then answer this question: Was such negligence a cause of the plaintiffs' injuries?" The jury answered, "Yes." Question 5 then asked, "If you answered 'yes' to Question 2 and/or 4, then answer this question: Were the plaintiffs negligent?" The jury answered, "Yes." The jury then answered Question 6 and Question 7, finding that Northridge's negligence was 20% causal.

> Then, after five questions on the misrepresentation issues and one question on the contamination issue, Question 14 asked, "On or before April 4, 1988, was the Monokote-3 in the Northridge and Southridge malls a nuisance or reasonably certain to become a nuisance?" The jury answered, "Yes." The next question asked the jury to determine the sum of money to compensate Northridge, and the final two questions related to the issues of outrageous conduct and punitive damages.

Majority op. at 282-83 (footnote omitted).

The jury was only given one question on the amount of compensatory damages suffered by Northridge; it was not asked to separate the damages based on the negligence and the nuisance verdict questions. Thus, the verdict as returned by the jury on December 21, 1994, contemplated only one damage award for all of Northridge's causes of action. Further, as part of its verdict, the jury answered that Northridge was twenty percent causally negligent.

A jury verdict must stand and is binding on a reviewing court if there is credible evidence to support it. *See Alaimo v. Schwanz,* 56 Wis. 2d 198, 203 & n.8, 201 N.W.2d 604, 607 & n.8 (1972). Thus, unless attacked by one of the parties, a valid verdict must stand as rendered by the jury.

A motion "attacking" the verdict "must be filed and served within twenty days after the verdict is rendered." Section 805.16(1), STATS. It is undisputed that the controversy surrounding the nuisance claim—that is, whether it was an intentional or negligent nuisance—first arose on March 2, 1995, at the hearing on Northridge's proposed order for judgment. Thus it was raised outside the twenty-day limit in § 805.16(1). Northridge argues and the majority agrees that if Grace had wanted the nuisance claim to be considered premised on negligence rather than as an intentional tort, it should have challenged or asked for clarification of the jury verdict on this point within the twenty-day time limit. I disagree with this argument and conclusion because the burden was not on Grace to challenge the verdict, but on Northridge to challenge the reduction by its contributory negligence.

I reach this conclusion by looking at what the verdict said at the time the jury rendered it. Indeed, we

should read the jury verdict "as a whole," regardless of the order that the special verdict questions were given and answered. *See Johnson v. Heintz*, 73 Wis. 2d 286, 306, 243 N.W.2d 815, 828 (1976). As stated above, the jury contemplated only one damage award for all of Northridge's causes of action, including the negligence questions and the nuisance question. The jury was not asked to determine a separate damage award for any intentional torts. Further, the jury determined Northridge was twenty percent causally negligent. Thus, for us to read the whole verdict as valid, we must conclude that the nuisance claim was premised on negligence—not as an intentional tort. There was credible evidence presented at trial to support this reading of the verdict. Further, nothing in the instructions presented to the jury on the nuisance claim conflicts with this assessment. Finally, a jury's apportionment of negligence—including contributory negligence—applies to all of the negligence-based causes of action in a valid jury verdict. Hence, here the jury concluded that Northridge was twenty percent causally negligent with respect to all the causes of action and thus the four corners of the jury verdict contemplated a reduction of the total verdict by that percentage.

Any challenge to this reduction of contributory negligence need not come from Grace—who was the beneficiary of this jury finding—but from Northridge. It is undisputed that Northridge never challenged the reduction of the jury verdict within the twenty days proscribed by § 805.16(1), STATS. Grace was therefore correct when it argued on March 2, 1995, that the reduction of the jury verdict was nothing more than a request for "the trial court to fulfill its duty to enter judgment on the verdicts." Majority op. at 283.

The majority wrongfully shifted the burden to challenge the verdict in this case to Grace. The trial court properly reduced the jury verdict by twenty percent. Accordingly, I respectfully dissent from the majority opinion on this issue.